UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

                      Plaintiff,

                                      **Indictment 1:21 Cr 00530-002 (SHS)**

       -against-

MARC ELEFANT,

                      Defendant.

-------------------------------------------------------X

## SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF MARC ELEFANT

Bachner & Associates, PC
Counsel for the Defendant
*Marc Elefant*
111 Broadway, Suite 701
New York, NY 10006
O:  (212) 344-7778
F:  (212) 344-7774
Email: mb@bhlawfirm.com

## PRELIMINARY STATEMENT

This sentencing memorandum is respectfully submitted to this honorable Court on behalf of Marc Elefant (also "Mr. Elefant," or "Marc") to aid in what is arguably the most important and difficult function a judge must perform—the imposition of a just and fair sentence on a fellow human being who has broken the law.

Up until this point, this Court has understandably had a narrow perspective of Mr. Elefant.  A perspective shaped by two trials involving several of Mr. Elefant's conspirators and his subsequent plea of guilty to consciously avoiding knowing that some of the medical procedures conducted on his clients from January 2017 through August 2017 were medically unnecessary. This memorandum presents to Your Honor a more expansive viewpoint of Marc Elefant the man: the loving husband; the doting, indispensable father; and the community volunteer and cynosure lauded without exception for his kindness, integrity, honesty and compassion.  To that end, we have attached over 100 letters of support from a variety of people, including his wife, Karen, his mother, Beverly, his three children, Max, Julia and Grace, his in-laws, his siblings, and his long-time friends, each describing his/her very personal reasons for asking Your Honor to temper cold justice with warm mercy when imposing sentence on Mr. Elefant.  Unfortunately, Mr. Elefant's misconduct and the prosecution that has ensued has had a uniquely deleterious impact on his nuclear family. Karen Elefant's significant pre-existing medical issues have been greatly exacerbated. His children, particularly Julia and Grace, continue to severely suffer psychologically from their father's arrest and the possibility that he will

be separated from them.  Mr. Elefant's too suffers from physical and mental ailments including Type II diabetes and Generalized Anxiety Disorder. For the latter disorder, he and has been in continuous treatment since 2017. To provide Your Honor with the clearest understanding of Mr. Elefant's situation, we have supplemented this memorandum with reports from mental health professionals and a videotaped presentation (https://vimeo.com/812259794)[1]explaining a best we can the genesis of Marc's misconduct; the impact his misconduct continues to have on his family;  and the critical lessons he has learned.[2]

The overarching sentencing principle behind 18 U.S.C. § 3553(a), often referred to as the parsimony clause, is that a sentencing court "*shall impose a sentence sufficient but not greater than necessary*" to meet the goals of sentencing.[3] (emphasis added)  "In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society and our economy, justifiable parsimony in incarceration is prized." *United States v. Sloane*, 308 F.R.D. 85, 87 (E.D.N.Y. 2015).

---

[1] The password for the link is ▮▮▮▮.

[2] We have also submitted a report independently prepared on Mr. Elefant's behalf by the The Aleph Institute, an organization formed in 1981 to provide support and rehabilitation to individuals enmeshed in the criminal justice and penal systems regardless of religious affiliation or social status. See www.aleph-institute.org.

[3] The parsimony clause was originally part of the House sentencing reform bill and was later added to the Senate resolution and adopted in committee.  The clause was "not just another 'factor' to be considered along with others in § 3553(a) – it sets an independent limit on the sentence a court may impose.  David L. McColgan & Brett G. Sweitzer, *Grid & Bear It*, *29 Champion 50, 50 (2005); see also* Richard S. Frase, *Punishment Purposes,* 58 Stan. L. Rev. 67, 83 (2005) (stating that the "structure of section 3553(a)," which lists the parsimony clause first, suggests strongly that this principle "sets overall limits on the crime-control and other purposes which follow.")

"Fortunately, thanks to the Supreme Court, district courts are now allowed to impose a sentence that varies from the Guidelines based solely on disagreements with the Guidelines, as long as they state the basis for their disagreement along with sufficient justifications for the extent of any departure." *United States v. Parris*, 573 F. Supp. 2d 744, 754–55 (E.D.N.Y. 2008) (internal citation and quotation marks omitted) (imposing a sentence of 60 months, varying from a guidelines calculation of 360 months to life).

As discussed more fully below, in this case, the § 3553(a) factors weigh heavily in favor of imposing a sentence that is <u>substantially</u> below the advisory guidelines range. Notably, the Presentence Report ("PSR") drafted by the Department of Probation has recommended a variance to 18 months incarceration. (PSR at p. 30) However, we believe that under the unique circumstances of this case, a non-prison sentence coupled with substantial community service and, if necessary, a term of home detention, is consistent with the "sufficient but not greater than necessary" linchpin of §3553(a).

As attested to in the attached letters containing the outpouring of community and familial support, Mr. Elefant's background and personal characteristics are truly exceptional. Much of Marc's personality was shaped by his relationship with his father, Martin, a compassionate and respected attorney who Marc Elefant adored and tried, but ultimately fell short, to emulate. As explained in several of the letters attached hereto, including Marc's own letter (B) and the attached video presentation, his misconduct in this case is wholly

antithetical to who he is and what he believes in, and was in some part influenced by his relationship with his dad. When Martin Elefant died of cancer at the age of 57 he left a gaping chasm in Marc's life. To fill that void, Marc worked very hard to establish himself professionally to prove to himself and to others that he too could succeed.  While on that road he ultimately ignored the very dangerous potholes which brings him before this Court.

Mr. Elefant continues to experience the severe repercussions of his offense. In August 2017, Marc withdrew as counsel from over 160 personal injury cases shortly after he was told by the government that they were fraudulent and that he was a subject of the investigation.  In December 2022, after over two decades practicing as a lawyer, Mr. Elefant has been disbarred as a result of his guilty plea.[4] Over the last <u>six</u> years, Marc's family has suffered through this painful and uncertain period.  The impact on his children's mental and physical health is tragic and sad.  By all accounts, Mr. Elefant feels shame and remorse for his aberrant conduct and the impact it has had on the victims of the offense, his family, and the community.  Notably, Marc has shown his contrition by also speaking to numerous young lawyers and other professionals about what he has done so that his example can be a deterrent to others and a lesson to ask questions, to use honest judgment, and to live up to one's ethical obligations. Cathartically, Marc has vigorously continued with his long-time charitable activities.

Considering the consequences that Mr. Elefant and his family continue to

---

[4] On November 16, 2022, Mr. Elefant was served by the Grievance Committee of the Appellate Division Second Department with a motion to disbar him based on his felony plea in this case. On November 29, 2022, Mr. Elefant directed counsel to advise the Grievance Committee that he would not oppose that motion.

endure and his extraordinary efforts to self-rehabilitate, we urge that a below-guidelines sentence of probation, coupled with community service, and if necessary, a period of home-confinement, would properly reflect the seriousness of the offense, promote the law, provide just punishment and achieve both general and specific deterrence.

Prior to addressing the § 3553(a) factors, we discuss our legal and factual objections to the PSR's conclusions.

### I.   The Vulnerable Victim Adjustment Should Not Be Assessed (PSR¶ 49).

### i.   USSG § 3A1.1(b)(1)

The PSR suggests that a "vulnerable victims" increase of two levels is warranted because the "patients who were recruited into the fraud scheme were preyed upon based on their lack of financial resources, drug addiction, homeless status, etc." (PSR ¶49)   United States Sentencing Guidelines § 3A1.1(b)(1) requires a two level enhancement "if the defendant knew or should have known that a victim of the offense was a vulnerable victim." While we sympathize with the unfortunate status of many of the patients/clients in this case, we disagree that they are "vulnerable victims" under the law for several reasons: a.) the patients/clients were active participants in the scheme and thus able to detect and thwart the misconduct; and b.) Mr. Elefant filed their lawsuits prior to January 1, 2017 when, under the terms of the plea agreement, he began to consciously avoid knowing that they had undergone unnecessary medical procedures.

ii.    **The Clients Were Conspirators – Not Vulnerable Victims.**

The sentencing commission commentary defines "vulnerable victim" as a "person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct) and (B) is unusually vulnerable due to age, physical or mental condition, or is otherwise particularly susceptible to the criminal conduct." USSG § 3A1.1. cmt. 2.

The courts have interpreted the phrase "susceptible to the criminal conduct" in the "vulnerable victim" enhancement provision as requiring that a particular victim was less likely to detect or thwart the crime, rather than more likely to suffer harm if the crime is successful. See, e.g., *United States v. O'Brien,* 870 F.3d 11, 12-13 (1St Cir. 2017); *United States v. Kaye,* 23 F.3d 50, 54 (2d Cir. 1994); *United States v. Hershkowitz*, 968 F.2d 1503, 1506 (2d Cir. 1992) (holding that prisoner who was surrounded by prison officers and then assaulted by one officer was vulnerable victim because he was "not in a position to resist"); *United States v. Caterino*, 957 F.2d 681, 683-84 (9th Cir. 1992) (affirming vulnerable victim enhancement because defendants knew or should have known of vulnerability of elderly victims to phone fraud scheme); *United States v. Altman,* 901 F.2d 1161, 1165 (2d Cir. 1990) (affirming vulnerable victim enhancement where defendant drugged his victims, making them "physically and mentally more vulnerable" to sexual exploitation); *United States v. Crispo,* 306 F.3d 71, 83 (2d Cir. 2002) (for the enhancement to apply, the victim of the crime  must have been "particularly vulnerable" because of his "substantial inability to avoid the crime.")   The courts have been very clear that

generalizations about people who belong to a specific class (old, poor, etc.) should be discouraged and avoided in making the vulnerable victim determination, *United States v. Crispo,* at 30-31 - - the inquiry should look to a specific person's individual attributes. In general, for *§ 3A1.1(b)* to apply, the victim of the crime must have been "particularly vulnerable" because of his "substantial inability to avoid the crime." *Id. at 51*. With that mind, Mr. Elefant's clients were neither "victims" nor "vulnerable."

According to the undisputed evidence, Mr. Elefant's clients were conspirators with Kalkanis and the runners in the scheme virtually from the outset. The clients agreed with Kalkanis and the runners to a.) intentionally stage their accidents; b.) to unnecessarily call an ambulance to transport them to the emergency room; c.) to lie to the EMS personnel, the nurses and the doctors about the "accident" and their "injuries"; d.) to conceal the fraud from Mr. Elefant;[5] and e.) and, at times, to undergo unnecessary medical procedures to increase the value of their respective settlements.  Given the clients' clear status as conspirators, it is not surprising that they requested and received non-prosecution or immunity agreements from the government.

We do not dispute that a person can be considered a vulnerable victim even if he or she was not the victim of the offense conduct.  *United States v. Wright*, 160 F.3d 905, 909 (2d Cir. 1998) (residents of mental care facility were vulnerable victims where embezzlement from care facility deprived residents of

---

[5] In the defendant's plea agreement, the parties stipulated that Mr. Elefant's conscious avoidance liability began in January 2017, about 21 months after Mr. Elefant began to accept referrals from Kalkanis.

adequate care).  However, a vulnerable victim adjustment only applies where the victim, as a result of his vulnerability, *was unable to detect or thwart the crime*. *United States v. Gill,* 99 F.3d 484, 486 (1st Cir. 1996) (This guideline "is primarily concerned with the impaired capacity of the victim to detect or prevent the crime, rather than the quantity of harm suffered by the victim."); *United States v. Kaye,* 23 F.3d 50, 54 (2d Cir. 1994) (The question is whether "a particular victim was less likely to thwart the crime, rather than more likely to suffer harm if the crime is successful.")   Accordingly, a vulnerable victim enhancement is not warranted where the alleged "victim" was, as here, <u>actively and knowingly involved</u> in planning and perpetrating the underlying fraud - - and thus able to detect **or** thwart it.  Thus, in each case where the enhancement was found, the victim was just that - - a vulnerable person who was unable to thwart or to detect the crime.  *See United States v. Whitlow*, No. 96-3246, 1997 U.S. App. LEXIS 23531, at *8-9 (10th Cir. Sept. 5, 1997) (defendant called elderly people, told them that he was their grandson, and requested money); *United States v. Gill*, 99 F.3d 484, 485 (1st Cir. 1996) (defendant treated mental health patients after falsely telling them that he was a licensed psychologist); *United States v. Bachynsky*, 949 F.2d 722, 736 (5th Cir. 1991) (It is clear that his "unwitting" patients were not aware that Dr. Bachynsky and his cohorts were falsifying insurance claims and "his patients relied on him to protect and improve their health, but instead he used them for his own gain.") *United States v. Echevarria*, 33 F.3d 175, 180 (2d Cir. 1994) (defendant "directly targeted those seeking medical attention by posing as a physician, exploiting their impaired

condition and luring them to his inadequate and dangerous medical attention for the purposes of defrauding third-party medical insurers"); *United States v. Wright*, 160 F.3d 905, 909 (2d Cir. 1998) (residents of mental care facility were vulnerable victims where embezzlement of monies of care facility deprived residents of any semblance of adequate care); *United States v. Burgos*, 137 F.3d 841, 844 (5th Cir. 1998) (patients of psychiatrist who committed billing fraud were vulnerable victims because they suffered harm; they were often needlessly admitted to the hospital and their stays were extended due to efforts to exhaust their insurance benefits); *United States v. Yount*, 960 F.2d 955, 956 (11th Cir. 1992) (institutionalized elderly were vulnerable victims where defendant bank employee embezzled funds from their accounts even though bank ultimately reimbursed the accounts; defendant intended to embezzle money from trust accounts of elderly and had he not gotten caught the account holders would have lost their money).  *United States v. Donnelly.*  370 F.3d 87 (1st Cir. 2004)  (victim of prison beating targeted because he suffered from Tourette's disease).

This is simply not the case here because the patients/clients were conspirators in the offense conduct and thus able to detect or thwart the crime. Accordingly, the adjustment should not be applied.[6]

---

[6] The case of *United States v. Borst,* 62 F.3d 43, 46 (2d Cir. 1995), relied on by the government (Dkt Entry #199, PSR, p. 27) in support of the enhancement, is inapposite.  There, the defendants lied to three financially desperate people in need of bank loans for their homes. The Court upheld the vulnerable victim adjustment even though they may not have been "unwitting instrumentalities" in light of their "apparent knowledge of the defendant's misrepresentations" to the lender. The  controlling facts at bar are plainly different.  Here, the Kalkanis referrals were active and willing participants in the scheme from the outset. In *Borst,* the defendants handled all of the paperwork.  The victims were mostly passive and because of their dire financial and medical circumstances, "were willing to overlook" and accepted as true the

### iii. It Was Not Until January 1, 2017, That Mr. Elefant Came to Believe that Unnecessary Medical Procedures Had Previously Been Conducted on His Clients.

Pursuant to the terms of the plea agreement, Mr. Elefant's is only responsible for the insurance company losses arising from 12 of the 25 cases that were settled as of January 1, 2017.  Under the plea agreement, it was only after January 1, 2017, that Mr. Elefant began to consciously avoid knowing that his clients had already undergone unnecessary medical procedures to increase the value of their potential settlements but settled the cases regardless.  Accordingly, Mr. Elefant did not know his clients were vulnerable victims at the time they underwent the surgical procedures in 2016.

The vulnerable victim adjustment applies only where the defendant knew that his victim was vulnerable. See § 3A1.1, Application note 1 ("It is true that the defendant must *know* that his victim is vulnerable in order to be given an extra dollop of punishment. A defendant who sells fraudulent securities to the general public is not  subject to a "vulnerable victim" enhancement just because one of the purchasers turns out, unbeknownst to the defendant, to be senile.)  Mr. Elefant's plea agreement with the government is based on 12 specific settlements, totaling $1,486,500, that he and his clients improperly entered into with insurance companies between January 2017 and May 2017:

---

defendant's apparent suspect explanations for some of the discrepancies in their loan documents.

| Client | Gross Settlement | Settlement Date |
| --- | --- | --- |
| Meldon Crawford | $60,000.00 | Jan-17 |
| Rose Felton | $55,000.00 | Jan-17 |
| Frantz Jean Mary | $135,000.00 | Feb-17 |
| Donald Freeman | $120,000.00 | Feb-17 |
| Juan Duclervil | $175,000.00 | Feb-17 |
| Jennifer Nervil | $250,000.00 | Mar-17 |
| Lonnie Quinitchett | $125,000.00 | Apr-17 |
| Corey Chandler | $250,000.00 | Apr-17 |
| Charlene King | $50,000.00 | May-17 |
| Darrell Felder | $160,000.00 | May-17 |
| Kareem Ryer | $24,000.00 | May-17 |
| Jonathan Simpson | $82,500.00 | May-17 |

Crucially, the civil lawsuit for each of these clients was filed and all related medical procedures were concluded before Mr. Elefant's conscious avoidance liability started on January 1, 2017. Accordingly, at the time that Mr. Elefant filed the lawsuits he believed the claims were legitimate and did know that his clients were either victims or vulnerable.[7]

---

[7]  Moreover, most, if not all of these 12 clients, were not homeless, or drug addicted, and did not appear to Mr. Elefant to be financially desperate. For example, Meldon Crawford, claimed to be employed as a construction worker; Rose Felton was on disability for asthma and previously worked as a driver at  Manufacturer's Hanover Trust; Donald Freeman worked for UPS on a temporary basis; Jennifer Nervil was a student; Lonnie Quinitchett was a construction

For all of these aforementioned reasons, the vulnerable victim enhancement should be rejected.

## II.     THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) STRONGLY SUPPORT A NON-CUSTODIAL SENTENCE

Subparagraph 2 of Section 3553(a) directs that in addition to the advisory non-binding sentencing guidelines, "[t]he court, in determining the particular sentence to be imposed, shall consider" the following factors relevant to this case:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed—

(A) to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with . . . medical care . . . in the most effective manner;

(3)     the kinds of sentences available; and …

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; … and

(7)     the need to provide restitution to any victims of the offense.

The factors enumerated in Section 3553(a) are the "bedrock of all federal sentencing". *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014). In crafting the proper sentence, the

---

worker; Corey Chandler owned a music production studio (his wife worked for the NYPD in an administrative capacity); Darrell Felder was a restaurant worker; Kareem Felder was a plumber's assistant; and Jonathan Simpson was a security guard at JFK airport.

"district judge should . . . consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party". In so doing, the judge "must make an individualized assessment based on the facts presented." *United States v. Davalos*, 2008 WL 4642109, at *1 (S.D.N.Y. Oct. 20, 2008) (quoting *Gall v. United States*, 552 U.S. 38, 40 (2007). "A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not." *United States v. Ramirez*, 2009 WL 4722237, at *2 (S.D.N.Y. Dec. 4, 2009).

Below we discuss *seriatim* the 3553(a) factors as they apply to Mr. Elefant's upcoming sentencing.

### a. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

**Mr. Elefant's Charge and Guilty Plea**

On October 24, 2022, Marc Elefant pleaded guilty before Your Honor to a one count superseding Information charging that from sometime in 2015 through August 2017, Mr. Elefant conspired to commit wire fraud in violation of 18 U.S.C. § 371.  The sole overt act set forth in the Information alleges that "[f]rom at least January 2017, up to and including at least August 2017,  Marc Elefant, the defendant, filed fraudulent lawsuits arising from staged trip-and-fall accidents." Pursuant to the terms of his plea agreement, Mr. Elefant's guideline range, after a three level reduction for acceptance of responsibility, is 21 and carries a possible prison sentence of 37-46  months.[8]

---

[8] Mr. Elefant and the Government reserved their rights to argue about the applicability of the two level vulnerable victim enhancement. Should Your Honor conclude that the enhancement is warranted, Mr. Elefant's guideline level increases to a 23 with a concomitant sentencing range of 46-57 months.

**The Relevant Facts.**

Sometime in the early spring of 2015, Mr. Elefant was approached by a neighborhood friend, Michael Kimmel, who offered to introduce Mr. Elefant to Peter Kalkanis as a source of personal injury referrals. In their ensuing meeting, Kalkanis told Mr. Elefant that he was a retired chiropractor and had access to personal injury cases. Kalkanis never disclosed to Mr. Elefant that he had been barred from practicing as a chiropractor. Kalkanis told Marc that the referrals were corroborated by various reports, such as EMS/ambulance reports, and emergency room interviews. After speaking with Kalkanis, Mr. Elefant spoke with his partner, Shawn Wallach, and they agreed to initially accept ten referrals involving slip and fall accidents.[9]

By January 2017, virtually every Kalkanis referred case included an emergency room report, and ambulance report, and at times, x-ray reports, corroborating the client's statement of facts. The client(s) would often be brought to Mr. Elefant's office by Reginald DeWitt, who claimed to be working for Mr. Kalkanis. As corroborated by the government's clandestine recordings, Mr. Elefant interviewed the clients separately and confirmed the facts of the accident, often going onto Google maps to see the actual location of the accident. At no time did a client say anything to Mr. Elefant giving him reason to suspect that the accidents were staged. On the contrary, as confirmed in the trial testimony and captured on recordings, both Dewitt and Kalkanis told the clients not to tell Mr. Elefant if their case was staged because he would refuse to be their

---

[9] Mr. Wallach has never been charged with wrongdoing.

attorney. (Second Trial Transcript at 1825)   After a retainer agreement was signed (all subject to further investigation of the facts), Mr. Elefant sent an investigator to visit the scene to obtain photographs and interview possible witnesses.[10] Once Mr. Elefant was satisfied that the case had value, he sent out representation letters to the property owner. If the case was not resolved pre-suit, a lawsuit was commenced. Notably, Mr. Elefant rejected about 30% of Kalkanis' referrals where, for example, the defect alleged to have caused the accident was not substantial enough to be considered an act of negligence; the client was simply too difficult a personality; or the client had a prior criminal history that would cause the jury to question or distrust him.  Kalkanis never disputed Mr. Elefant's decision to reject a case.

As is customary in personal injury cases, Mr. Elefant, as counsel, had little and at times no involvement in his client's medical treatment.   His communications with Drs. Dowd and Ribeiro were extremely limited, and generally revolved around when a report could be expected or asking to explain the reason a particular conclusion was reached.  In or around the summer of 2016, however, things occurred that caused Mr. Elefant to suspect that the treatment being provided to his clients was either below par or unnecessary. For example, in July 2016, Peter Martin, a chiropractor, emailed Mr. Elefant claiming that patients were not seeing him but going straight to surgery.  (Second Trial Transcript, at 965)  Mr. Elefant emailed Martin in reply and told him that

---

[10] In a number of instances, eyewitnesses were located who verified the accident and were deposed under oath.

his "email is erratic and confusing. I do not understand it at all."[11] Mr. Elefant then spoke with Kalkanis to express his concerns. Kalkanis told Marc to ignore Martin because Martin had a substantial drug problem and that his chiropractic services were no longer going to be used.

In or about November 21, 2016, Mr. Elefant emailed Kalkanis regarding a patient's report that appeared inconsistent with the MRI reports. Mr. Elefant asked Kalkanis to explain why

> Dowd's report more times than not seems to contradict the MRIs. Here like in many other MRI says medial tear and the operation says lateral tear. How can the MRI find a tear on the opposite side of the knee and he sees when he's inside? Can you please get me an answer to this?

Kalkanis responded with a full explanation, which included charts detailing for Mr. Elefant the reason for the apparent discrepancy in the report. Mr. Elefant also met with Dr. Dowd in the latter's office to discuss the issue. Thereafter, Dowd sent Mr. Elefant detailed medical reports explaining the apparent discrepancy. Although Mr. Elefant left the meeting with answers, he was becoming more and more bothered about the efficacy and the need for the medical procedures. Unfortunately, instead of asking more questions, doing more research, and trying to confirm his suspicions, Mr. Elefant moved forward.

By January 2017, Mr. Elefant's law practice had close to 200 active files, consisting mostly of cases referred by Kalkanis. By that time, Mr. Elefant's practice was being managed and operated by himself, his legal partner, Shawn Wallach, and a paralegal Tiffany Johnson. Ms. Johnson answered the phones,

---

[11] Mr. Elefant had previously complained via email and by telephone to Martin that his chiropractic reports were late and caused unnecessary delay in the litigation.

gathered medical records, prepared opening letters on cases, and did other administrative office tasks. Mr. Elefant interviewed clients, handled the financial and various administrative matters, monitored the outside document drafting company and negotiated with carriers. Mr. Wallach handled most of the depositions, reviewed and finalized the pleadings and conducted the motion practice. The volume of cases impacted the pace at which files moved and Mr. Elefant's ability to properly control the cases. He became less careful in evaluating the cases. During that same time period, Mr. Elefant's questions regarding the clients' surgeries all performed in 2016, turned into outright concern that the surgeries were unnecessary and had been done to generate surgical fees and to prop up the value of the lawsuits which were being funded by litigation companies. Mr. Elefant rationalized to himself that the explanations he was given by Kalkanis and Dr. Dowd were sufficient and chose to look the other way, ignoring what at this point should have been obvious to him – that a fraud was occurring and that some of the medical procedures were unnecessary.

From January 1, 2017 through May 2017, a five month period of time, Mr. Elefant settled 25 cases with the insurance companies, 12 of which (40%) form the basis of his plea agreement. A total of $1,486,500.00 in inflated settlements was paid based on the unnecessary medical procedures that were done in 2016. From January 1 through May 2017, Mr. Elefant also commenced other lawsuits which involved other unnecessary medical procedures conducted in 2016. However, none of those lawsuits were settled.

In May of 2017, Mr. Elefant was telephoned by a very upset client who

told him that she was just served with a subpoena signed by AUSA Nick Folly. That same day, another client called him and stated that he was questioned by police about his accident and told by them that they knew the accident was staged and the medical procedures were unnecessary. The client was shown a picture of Mr. Elefant.  The client told Mr. Elefant that the FBI was wrong and that the accident was legitimate. Mr. Elefant retained criminal counsel who called AUSA Nick Folly. Mr. Folly told counsel that Mr. Elefant was a subject of the investigation and that they believed <u>every</u> lawsuit brought by him was based on a staged and fraudulent accident.[12]  Counsel agreed to accept service of all Grand Jury subpoenas, and eventually provided the government with non-privileged documents, including emails.

    As a result of all that had just transpired, in May of 2017, Mr. Elefant consulted with ethics counsel, Judah Z. Cohen, Esq., and Jonathan M. Cooper, Esq., since he was concerned that a conflict now existed and he could end up being a witness against his clients.  All counsel agreed that Mr. Elefant needed to withdraw from the cases. Mr. Elefant did so without hesitation.  Mr. Cooper, who also knows Marc personally, writes to Your Honor as follow:

> When Izzy learned of the criminal investigation by the Southern District of New York, he reached out to me for my guidance on some of the ethical questions he faced regarding his existing clients.  At that time, we did not anticipate any indictment against Izzy (indeed, the indictment was handed down only four years later); rather, Izzy's concern was making sure that the cases he had been referred by this seemingly tainted source  was approached and handled ethically.  I worked with another colleague,, Judah Z. Cohen, Esq. to counsel Marc on his ethical obligations.  To that end,

---

[12] Months later, apparently after debriefing Mr. Kalkanis, the Government advised counsel that most of the cases - - not all - - were fraudulent.

at first blush, one might think this was an easy call, but it was really quite complicated. At first, the government had taken the position that every single case was fraudulent. Afterward, the government's position changed to "most" of the cases were fraudulent. As the attorney of record, Izzy was duty-bound to advocate zealously on their behalf. At the same time, Izzy might be called as a witness and was therefore in a conflict position with them. Ultimately, after weighing the different alternatives, we agreed that Marc should withdraw/discontinue all of the cases that had been referred to him by this (tainted) source. In August of 2017, Izzy, with the knowledge of prosecutors, notified each client by letter that he was withdrawing as counsel by virtue of the government's investigation and discontinued or withdrew from over 160 cases – many of which, we understand, were later settled by new counsel.  (Ex. A)

With the government's knowledge, and at defense counsel's direction, Mr. Elefant mailed letters to the affected clients, advising them, among other things, that their claim was "under investigation by law enforcement giving rise to  an unavoidable conflict of interest that prevents this firm from continuing to represent you. . .  Should you wish to continue with your case, you should immediately contact and consult with other counsel to permit them sufficient time in which to continue with your lawsuit and protect your interests. We believe that new counsel should also be notified of the investigation by law enforcement."

Thereafter, Mr. Elefant ceased working on all but 7 files which were indisputably legitimate. Ultimately he withdrew from over 160 cases, which essentially closed Mr. Elefant's law practice.[13] Four years later, Mr. Elefant was

---

[13] Many of the cases Mr. Elefant dropped were settled by new attorneys despite their knowledge of the investigation. Some refused to take on the cases.  Many of the plaintiffs opted not to go forward with the lawsuits.

arrested at his home.

## III.  MARC ELEFANT'S HISTORY AND CHARACTERISTICS

It is no accident that the first criterion under § 3553(a) – The Nature and Circumstances of the Offense *and* The History and Characteristics of the Defendant - was drafted by Congress in the conjunctive.  In imposing a fair and just sentence, justice dictates that the crime committed by a defendant should not be viewed separately in a vacuum but instead in light of the defendant's unique humanity.  It has long been recognized that a defendant's character is always "a central consideration in the fashioning of a just sentence." *United States v. Merritt*, 988 F.2d 1298, 1307 (2d Cir. 1993).  The U.S. Supreme Court has voiced a similar opinion```. *See Gall v. United States*, 552 U.S. 38, 52, 128 S. Ct. 586, 598 (2007) ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue'" (quoting *Koon v. United States*, 518 U.S. 81, 113, (1996)); *see also* 18 U.S.C. § 3661; U.S.S.G. § 1B1.4 (sentencing court not limited regarding the information about a defendant's background, character and conduct that it may consider for the purpose of imposing an appropriate sentence).

As attested to in the over 100 letters attached to this memorandum, Mr. Elefant's personal history and circumstances are exceptional.  Throughout his life, Mr. Elefant has been devoted to his family.  Mr. Elefant achieved some level of professional success based in no small part on the care and compassion he had

for his clients.   Marc showed the same kindness and compassion in his community devoting literally hundreds of hours in volunteer work for his synagogue and for the community at large, including working at a food pantry, organizing the feeding and caring for the poor, visiting the sick in hospitals, and consoling those who experienced a death in their family. This kind and compassionate man is the true Marc Elefant.  The crime Marc Elefant committed here – and its motivation as discussed *infra* - is an aberration in an otherwise exemplary life which must not be allowed to define him at this most crucial time of his life.

As the respected jurist, the Honorable Jed S. Rakoff so eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant'.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

A.  **Marc Elefant's Family Background.**

 Fifty-one years ago, Marc Elefant[14] was born in Brooklyn, New York to Beverly and Martin Elefant.  Marc has three siblings; his sister, Alisa Levy, age 57, is breast cancer survivor and homemaker residing in New Jersey; Dov, age

---

[14] In the letters to this Court, Marc is invariably referred to by his friends and family as "Izzy" -  a nickname derived from his Hebrew name.

55, is the Chief Financial Officer for a medical device company; and Barbara Solomon, age 48, is a teacher in Florida.   Marc is very close with his siblings.

Marc's father, Martin Elefant, was a respected trial attorney who specialized in personal injury and criminal defense cases.  He was also Marc's icon and inspiration to become a lawyer.  Tragically, Martin Elefant died in 1992 at the relatively young age of 57 after a 14-year battle with non-Hodgkin's lymphoma. Marc had a loving but complicated relationship with his father, striving to make him proud but feeling daunted by his dad's abilities. Marc writes as follows:

> As I grew up through school age, I was never the best student, but not the worst.  I managed to get by unlike my older siblings who faired much better than me.  I always felt a need to prove myself.  Especially, because my father who was a well-respected and talented attorney made me feel this pressure.  His abilities far surpassed mine and I always wanted to make him proud.  I had a very close relationship with my dad. We found common ground with the Law.  Even at a young age in high school I connected with classes when we learned about the founding of this great country, the Constitution and Supreme Court.  I can remember working on a paper with my dad on some the most landmark Supreme Court cases, like Brown v. Board of Education, Gideon v Wainwright, Miranda v Arizona and others. I felt inspired.

> In the twenty years I had with my dad I learned some critical life lessons.  Work hard,  do the right thing, treat all people with respect and always be there to take care of your parents. The way he respected and cared for my grandparents was textbook. I looked up to him and to me he was larger than life.  However, I often doubted my ability to make my dad proud.  Paramount to my dad was the way he treated people. He always saw the good in people and giving them the benefit of the doubt.  He cared about that more than financial success. Over the years my father practiced a fair amount in the Federal Criminal system, and he never spoke ill of clients that were accused of violent crimes.  He always saw the positive in people.  I've tried to live my life through this lens.

> I was constantly in awe of my dad.  Seeing how he went to work every day as a sole practitioner and took care of his

family. He was my hero.  When I lost him at age twenty, I was devastated.  I had lost my best friend who would always give me the right answer.  Now that I am older, I know what a herculean task it was to be a sole practitioner for 30 years. The loss of my dad left me with a large void, but it propelled me to stay on course and become a lawyer so that I could help people like I saw my dad do for my entire life.  Until this day, when I would meet an older lawyer still in practice (as my dad would be 87 today) I would hear one tremendous story after another about my dad and how he changed someone's life.  I wasn't sure if I would make it. In College I performed poorly on the LSAT and was not accepted into Law School directly.  I was fortunate that Pace University had a summer program I was invited to that guaranteed admission based on my performance on two classes that Summer.  That is how I was admitted to law school.  I doubted myself and my ability along the way and perhaps if my dad had not died, I would have given up and never followed in his footsteps.  If I internalized anything from my dad it was doing your best and no matter what a person's station in life was, could be the janitor or the President, they demanded the same respect. That is what I set out to do.  (Ex. B)

During his father's illness, Marc attended Yeshiva University and though living on campus, he travelled home routinely to help his mother care for his father and to just simply spend time with him. Marc was traumatized by his father's death and did everything he could to see to his mother's well-being.  So, Marc moved off campus from Yeshiva University and moved back to his home where he took a year sabbatical from school until 1994 to care for his mother. In 1994, Marc enrolled in Pace University Law School. He recalls those times as having drastically changed his perspective on his obligations to his family:

When my dad passed away, I was 20 year old and I knew that day my childhood was over.  I was the oldest child living at home and felt my dad's presence come over me and had to be there to take care of my mother.

Just before his passing, I recall telling him that "I was going to be fine and that I would take care of mommy".  I have wondered since then if he heard me and understood what I

was saying.  That was my moment where I began my mission to forge my own path to success.  I don't mean financial success.  Everyone wants to be financially successful no doubt, but my parents showed me that success was more than that.  Its creating a life, a family that loves you and being able to help people in need.  I decided that I was now responsible for my mother and younger sister.  I moved home from college and commuted from Brooklyn to Washington Heights in upper NYC  four days a week to finish my last year of college.

I began law school at Pace University in White Plains in 1994.  While I had an apartment near campus, I was constantly home with my mom in Brooklyn committed to following what I promised my dad. *Id.*

Mr. Elefant's mother, Beverly, recounts those difficult years and Marc's

devotion, as a twenty-year old, to her and to the family:

It was devastating to Izzy when his father was diagnosed with cancer when Izzy was under 10 years old. It was a heartbreaker for Izzy when his father fell out of remission in the early 1990s and slowly deteriorated, until his early death in April 1992. Izzy was only 20 years old at the time. My husband passed away three days before Passover in 1992 which under Jewish Law shortened the normal seven-day mourning period. This was another challenge for Izzy. He did not get sufficient time to properly mourn his father. At the time, Izzy was a junior in college with his older siblings married and out of the house. Izzy refused to allow me to be alone with my younger daughter, Barbra, so he moved back home to Brooklyn and commuted to Washington Heights 3-4 days a week. This is the man I want you to see when you are deciding on his sentence. Not many 20-year-olds who just watched their best friend and father slowly die, in a hospital bed setup in the family dining room, would jump right in and take charge like Izzy did.  He is a sweet, honest, respectful, and caring person.  He has always put others ahead of himself from the time his father passed away and he embraced his role without a complaint. . . .

I was alone in our family house for the first time. I cannot tell you how often Izzy came home to be with me. I often asked him why he was paying rent. Izzy gave up so much of his social life so  that I would not be alone on weekends. I was so thankful for his consideration, respect, and most of all his

love. I was so proud of the young man he'd become and the way he wanted to take care of me any chance he could. (Ex. C)

Mr. Elefant's older brother, Dov, is the CFO of Fernasys, Inc., a medical device company located in Georgia. He too recalls that as a child growing up, Marc was very close to their father and looked up to him. At a young age, Marc showed particular interest in his father as a lawyer that eventually catalyzed Marc to follow in their father's footsteps.  After Martin Elefant died, it was Marc who stepped up to care for his mother – a function he still gladly performs to this day:

> Izzy would be attached to my father's hip as a child and as a teenager was always interested in his work. He would frequently inquire about his cases and offer his assistance. It was what led Izzy to law school and eventually to practice law. If my father would have been alive, I think it would have been Elefant & Elefant, attorneys at law. Sadly, he passed away from cancer at age 57, when Izzy and I were 20 and 24, respectively. As you can imagine, this was a very tough time for my family.
>
> I think Izzy decided on personal injury law as his way of continuing my father's legacy of helping people in need. Izzy would always tell me about his cases and how his client has suffered a wrong and were entitled to be compensated.  He had a special caring for people less fortunate as he felt that they were overlooked and always got the short end of the stick. He was thankful that in some way he could help them right the wrong they suffered. Many times, over the years, he reflected with me how a client's life was changed for the better and how it made him feel good that he was a part of that.
>
> When my dad passed away, Izzy was only 20 years old, and one may have expected him to need our help. However, Izzy stepped up and took on the role of "man of the house." While in college and subsequently in law school he took on the added responsibility of being there for my mother and sister "locally" as Fanny and I, and my older sister were no longer living in Brooklyn. He continues today, to be the same caring son to our mother now (she is 81) and

> always looking out for her best interest and providing emotional and financial support when necessary. (Ex. D)

Mr. Elefant's sister, Alisa Levy, also recounts that her brother "looked up to our father and worked hard to follow in his footsteps, especially after our father passed away." After their father died, it was Marc who took the oar to see to his mother's well-being. Ms. Levy notes that her brother is an

> extremely devoted and caring son to our elderly, widowed mother. She depends on him for advice as well as emotional and financial support. When our father passed away, Izzy became the man of the household and took on many adult responsibilities at a young age. He and our mother have a close relationship and she encouraged him to pursue his interest in the law. (Ex. E)

## B. **Marc and Karen Elefant**

In 1996, Marc met the love of his life, his wife, Karen (nee' Mann). Marc describes his adoration for his "soulmate" Karen:

> It wasn't until 1995 when my mom remarried that I eventually moved in with friends in Queens while finishing law school. About a year later, after years of hardship dealing with my dad's passing and uncertainty with my mom, I got the luckiest break of my life. It was a gift from G-d. I was out with friends in Manhattan at a party and saw the most beautiful, tall, and striking woman. Her name was Karen. Now Karen Elefant. She is my soulmate. My balance. It was truly love at first sight and we've been best friends for over 26 years.
>
> Karen is unique in many ways. Her incredible giving nature is rare. She always puts herself last. She's about love, family and our children. Nothing else matters. (Ex. B)

Karen Elefant has been employed by the New York City of Education for over 20 years. (PSR ¶ 71) Karen's mother, Aviva Mann, recalls that after she met Marc for the first time, she

> understood immediately why Karen had connected with

> him. He was gentle, respectful, loving and kind. We were always happy when he spent time here while they were dating. We knew from the start that he was special to Karen who had always been very perceptive about people and very decisive as well. Our friends who knew Izzy from childhood all told us how special he was. He had great integrity; he was always the first to help when he saw someone in need. (Ex. F)

Karen's brother, Jeff Mann, has similar memories of Marc when he began dating Karen. He describes Marc's "integrity and sense of honor," and how "hard he worked to complete law school, both to honor his late father, also an attorney, and to ensure that he would be able to build and support his own family." (Ex. G)

Marc's devotion even then what not limited to his own immediate family. Marc's brother-in-law, Eric Mann, is a real estate developer. Shortly after Marc and Karen were engaged to be married, Marc showed his true character and acted to save his mother-in-law's life:

> I remember when Izzy just got engaged to my sister Karen and my mother suffered an unexpected heart condition. She was home alone and before an ambulance was called, he arrived and quickly drove her to the hospital. He spent the entire time by her side in the hospital and made sure she was cared for until her other family members arrived. I attribute his quick and caring actions for the reason my mother is still alive. My mother was recently diagnosed with cancer and Izzy has been the one to chauffeur her to and from her countless appointments for treatments at Memorial Sloan Kettering in New York City. Izzy has always treated my parents with kindness and devotion and for that I will be forever grateful. (Ex. H)

Shortly after Marc graduated law school in 1997, Karen and Marc were married.

### C. Mr. Elefant's Dedication to and Responsibility

**For His Family's Well-Being.**

The Elefants have three amazing children. Max, age 22, is a songwriter and is studying religion in a Yeshiva located in the Five Towns. He was 15 when the investigation began in 2017. Julia, age 20, was 14 when the investigation began, and is now enrolled in the Stern Business School at NYU. Grace, age 13, was just 7 when the investigation began, and is now a 7th grader at the Hebrew Academy of Five Towns & Rockaway. Throughout his life, Mr. Elefant has been devoted to his family.  Letter after letter attests to Mr. Elefant's unconditional love and devotion to them. Marriage and parenthood are his crowning achievements. His relationship with his children is uniquely strong – but severely damaged by his misconduct.

Leyna Mann, who is married to Marc's cousin, describes Marc as the "quintessential family man." (Ex. I).  Marc's mom, Beverly, writes that

> Izzy has a unique relationship with each of his children. He's the most encouraging and supportive Dad to his children and provides the attention to them as their individual needs require.  I'm sure the loss of his Father at 20 years old instilled in him the importance of building a strong relationship with his children.  Izzy's special connection to his children is most concerning to me should he be separated from them for any length of time. Notwithstanding his wrongdoing, Izzy has suffered watching the effects of this case on his children and how they have suffered because of him.  I am pleading with you to consider this into your decision.  (Ex. C)

Dov Elefant writes that his family is the "absolute world to him," and describes the close relationship they have with each other:

> Izzy was last of us to settle down. After my dad died, it was almost like had to be sure that my mom and sister were ok before he was ready to move on with his life. In 1996 he

> met his loving wife Karen and started a family of his own;
> Max, Julia and Grace. They are the absolute world to him.
> The oldest Max is also named after my father and has such
> a pleasant disposition which is attributed to Izzy. Julia, the
> star basketball player on every team she played on, had the
> best cheering squad at the game. Izzy was at every game,
> never missing an opportunity to watch with pride as Julia
> played for a championship in Middle School and High
> School. Grace, the youngest, is truly daddy's little girl, and
> they are extremely close. Grace idolizes her dad and
> looks up to him as she continues to mature.  (Ex. D).

Mitchell Mann, Karen's father, is a retired teacher and principal and was an elected member for 9 years on the local school board.  Mr. Mann also oversaw High School Attendance Teachers (Truant Officers) throughout New York City.  He has unfortunately witnessed the impact of Marc's behavior on Mr. Mann's three grandkids – they "suffer immeasurably.  It terrifies me to think what any future separation from their father may do to them." (Ex. J)

Eric Mann has seen first-hand the dedication Marc shows continuously to his wife and his children and is seriously concerned over the deleterious impact the prosecution has already had on the family and will continue to have should Marc be absent from them:

> I have witnessed the sacrifices he made to give his three
> children the best possible lives over the past 22 years by
> being involved in their daily lives, whether doing
> homework with them, playing sports, coaching their
> teams, and taking them to countless afterschool and
> weekend activities, often while working two or more jobs
> and tirelessly volunteering his time in his community. I
> can personally vouch for the closeness between Izzy,
> Karen, and their children and can directly connect Izzy's
> hands-on parenting as the reason they are growing up so
> well. Izzy's children have been seriously impacted by this
> prosecution. Izzy is the first to admit that his conduct has

brought him before the Court, and he has expressed enormous remorse for his conduct. Still, his children have truly suffered and continue to do so. They are very close with him, and I am truly concerned about their emotional stability. The removal of his guiding presence in their lives at the pivotal times each is currently in educationally, professionally, or personally is a tremendous loss. I beg that you consider the devastating impact Izzy's absence would have on them. (Ex. H)

Karen Elefant's cousin, Ilana Mann, is an educator experienced in child-parent relationships. About Marc, she has observed with admiration the relationship he has with his family, noting that he is a "hands-on, active father, and seeing how attentive Izzy is with his children and the admiration that I've seen time and again of each of his children towards him." (Ex. K).

Michael Mann is an attorney at the law firm of Simpson Thacher & Bartlett. Mr. Mann notes that the Elefant children's kind,

hard-working yet fun-loving personalities were not developed in a vacuum. Izzy has been a role model for his own kids, for mine, and for so many others. He has been an integral driver in raising his children to become what they have and to continue his legacy of hard work, family and community. Simply put, his children would be devastated by the prolonged absence that an extended sentence would bring. (Ex. L)

Bruce D. Strook is Marc's uncle through marriage. In his letter, he writes that he has "always observed the bond that exists between Marc and his wife Karen and their beautiful children. It is also easy to observe the closeness that exists even today between Marc and cousins and other relatives." (Ex. M)

Marc's cousin, Daniel Strook, has maintained a close relationship with Marc and his family. He has seen the close and caring relationship Marc

has with his kids, and particularly with his 13-year old daughter, Grace:

> I have the unique opportunity to spend time with my student, Izzy's youngest, together with her father, at family functions. The easygoing closeness of their relationship is obvious and inspiring. His deep care for her, for her success in the classroom and the hope that she will set her life on a journey toward worthwhile endeavors is heartwarming. And her reliance on him to be solid, strong and present is just as clear. It is the same with all of his children. With his adult children, he nurtures and encourages but accepts that they will chart their own course. This is also something that we have discussed at length. (Ex. N)

Rachel Gottfried has known the Elefant family for years and has personally witnessed the close and tender relationship Marc has with them:

> Izzy is an extremely loving and devoted father and husband to his wife, Karen, and his children, Max, Julia and Grace. My children and his children have grown up together and have spent countless days, hours, and minutes together in each other's homes. He not only treats his children with extreme love and devotion, but my children as well. He has been so intimately involved in all of his children's daily activities, such as getting them up in the morning and helping them get ready for school, making their lunches, driving carpools when he's around, and helping them with schoolwork.  He was our son's little league coach for many years and treated each child with the utmost kindness and respect, making sure each child played equally, no matter their skill level. He goes to every single one of his kid's basketball games and attends parent-teacher conferences. (Ex. O)

Steven Stern is a partner at the law firm of Stern & Schurin, LLP and has known Mr. Elefant for many years from their synagogue.  Mr. Stern describes the emotional glue Marc is to the family, particularly regarding his youngest daughter, Grace:

> Izzy is a true "family man."  He is the rock and foundation that provides constant emotional support for his family,

> especially his wife Karen and his youngest daughter, Grace, whom I have had the pleasure of seeing grow up since she was a little girl.  Grace and my daughter Lizzy have been best friends for nearly a decade into middle school.  Since we joined the community, Grace has visited my house innumerable times.  I cannot recount a single instance where Grace would visit our home and not be smiling, laughing, singing and dancing. That is the home that Izzy built for his wife and children – a home of happiness, a home of innocence, a home of laughter. It weighs heavy on my heart to think about how Grace may possibly have to be without her father for any period of time. (Ex. P)

Robert J. Wilon is an attorney who attends Mr. Elefant's synagogue.   He has known Marc for well over 20 years.  During that time, Mr. Wilon's children have become close with the Elefant's children and he has personally seen Marc's deep  involvement in their  daily lives:

> On a more personal note, through our communal work, Marc and I have become close friends and our wives and children have become good friends as well. Marc is an exceptional father to his 3 children Max, Julia and Grace.  He is the dad who never missed a little league game or a dance recital and always made sure the entire team had fun and that each team member felt good about themselves.   He is extensively involved in the daily lives of his children and is a positive influence on them. Marc is a dedicated husband and son and a truly exceptional family man.  (Ex. Q)

Rabbi Mendel Gordon is the spiritual leader of the Chabad of Hewlett Neck and Old Woodmere.  Over the year he has spent hours visiting with the Elefant family and seen the loving interaction between them:

> Through Izzy, I have gotten to know his family as well. I have spent time at their home, and we have hosted them for Friday night shabbat dinners. The care and attention Izzy pays to  his wife Karen and their 3 children is remarkable. He is clearly devoted to them, and they rely on  his love and sensitivity to  hold them together. It is beautiful to see how his children adore him, doing whatever they can to be closer to  him. Especially his

youngest daughter, Grace, who is 12 years old. Her relationship with her father is everything to her, and I shudder to think what Izzy's incarceration could do to this young girl. I recall once when we were supposed to study together in the synagogue Izzy asked if we could move the session to his home, as his daughter Grace was ill and he didn't want to leave her. That day I truly witnessed his devotion to her, and the attention she receives from her father, with Izzy tending to her with loving care, and how she felt when he would check on her or bring her something, the relief she would feel just from having her father near her. (Ex. R)[15]

Many others have written to Your Honor about their perspective on Marc's uniquely endearing relationship with his wife and children. Jason Meyer has known Marc and Karen for 31 years. He describes Marc as the very definition of "family man" and the "family's anchor" that would "certainly be emotionally lost without him." Mr. Meyer notes that Marc's bond with Grace, his youngest child, is "immeasurable" and that his "calming smile" serves as a palliative for her serious anxiety. (Ex. S)

Mr. Elefant's vital and indispensable relationship with his children has been placed in jeopardy by his conduct in this case. Even worse than the possibility of prison, is the psychological trauma he subjected his children to and the damage that resulted to them.

### D. **Mr. Elefant's Daughters Have Suffered Inordinately From Their Father's Misconduct**.

As this Court knows all too well, a defendant's family is often the victim - the collateral damage - of his/her criminal conduct. At times, however, the damage caused by a defendant to his loved ones by his misconduct and the

---

[15] Grace was 12 years old when many of the letters to the Court were written. She is now 13.

concomitant prosecution is extraordinary. Tragically, because of the intensity of Mr. Elefant's involvement in his children's lives, the impact on their emotional well-being from their dad's case, specifically on Julia and Grace, has been distinctly injurious.

### i.   **Maxwell Elefant**

Maxwell Elefant is Marc and Karen's 22 year old son.  Maxwell is songwriter who hopes to have his music published.  He is a very spiritual person and is studying the Jewish religion at a well-respected yeshiva near his home. Mr. Elefant knows that Maxwell is "hurting," and that as the older son, he is projecting strength for his mother and sisters:

> Max is a quiet and sweet kid that doesn't talk about himself a lot.  I've had many conversations with him about the situation we are facing as a family, and he's always more concerned about his mother and sisters.  I know he is hurting. Max, having become more religious, is getting to the marriageable age where he will start dating, and in his circles that process can move fast.  He has told me he is concerned I will not be there for his wedding!  (Ex.  B)

Karen Elefant knows how close Max and his father are. Max has voiced his concerns to her that he cannot cope without his dad:

> Max, now 22 years old is currently studying Judaic Studies at a local school in Woodmere, NY, has graduated college and is pursuing a music career.  He is trying to be strong for the rest of us, but I know that he is in pain.  He depends upon Izzy for advice and guidance.  He is concerned how he would possibly cope without the potential of not having his father for any period of time.  He is at a critical age where he is making life decisions and is looking to get married soon.  He needs his father.  (Ex. T)

Regardless of his inner turmoil, Max, perhaps because of his deeply held

religious perspective of the world, focuses on the positive lessons he has learned from his dad and the truth about who his father is.  He knows better than most that his father is not a criminal – he is a man who committed a crime.  Maxwell learned from his father to treat every person, regardless of who they are with ultimate respect; to be an "advocate for honesty and trying to do one's best with the utmost integrity in any pursuit."  (Ex. U)  Maxwell knows that his father's misconduct in this case was an aberration.  He is proud that his father owned up to his guilt – never shifting blame – and through his remorse in on the road back from perdition:

> My father undoubtedly slipped up and he deviated from his natural tendencies and has since been paying the price. Not only has he himself been suffering the consequences for his actions but his family as well and that is what hurts him the most. My dad has spent his life trying to help people, and I know he is ashamed of his actions. His remorse is real. It's written on his face all the time. (Ex. U)

Maxwell is too concerned about his younger sister's welfare to focus on his own.  The impact of his father's arrest on Julia and Grace has been devastatingly profound.  Maxwell describes his concerns and fear should his father be ordered to prison:

> I would be remiss not to mention the concerns I have for my younger sisters. It pains me to discuss my sisters in this light. ██████████████████
> █████████████████████████████████
> ████████████████████ ██████████████
> █████████████████████████████████
> █████████ ████████████████████████
> █████████████████████████████████
> ██████████████████████████ I'm most

worried about her. She is a very sensitive sweet kid and relies on my dad for a lot. She does not deserve the nightmare we have all been living. For my father to be separated from my sisters for any length of time would be devastating for them. *Id.*

### ii.   <u>Julia Elefant</u>

Julia Elefant is Marc's 19 year old daughter. She is a sophomore at New York University Stern Business School. Julia has written a heartfelt letter to Your Honor hoping to "convey to you the impact my dad's arrest and conviction have had on his children, and the pain we know he is going because of what he did and how helpless he feels witnessing the extreme suffering of his children. Our suffering is made only more difficult because we love dad so much and know, that despite his misconduct, he is a good man and an amazing father." (Ex. V)

Julia was in Israel for just three days of a one-year program studying abroad when she received a phone call that her father had been arrested. She writes that she suffered "overwhelming confusion," "relentless anxiety and stress simply built up inside of me with no outlets to release from." *Id.* ▮



████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████ But while my
mother was experiencing her own set of mental pain, despite
his own mental stresses, my father was there for me. Day
in and day out checking up on me and getting me through
some really dark days. ██████████████████████████
████████████████████████████████████
███████████

Julia's mom, Karen Elefant, has witnessed her daughter's emotional

breakdown – █████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████: 

Julia is now 19 years.  She's a student at NYU Stern School
of Business in her sophomore year.  Julia had left for a gap
year of study in Israel four days before the FBI came to our
home.  I had the painful job of calling our innocent sweet
daughter in a foreign country to shatter her world and give
her the news of her father's arrest.  Due to Covid restrictions
I could not visit her in person.  We will both always carry
that pain.  She struggled to make sense of this, saying "he is
literally the best person I know".  We believed that Julia was
handling this as well as could be expected but learned a few
months later that she was truly suffering.  ██████████████
████████████████████████████████████
████████████████████████████████████
██████████████████ Julia who was always happy and healthy
was ██████████████████████████████████
████████████████████████████████████
██████████████.  Towards the end of the year, I received a
message from the head of her school, ██████████████████
████████  ████████████████████████████
████████████████████████████████████
████████████████████████████████████

the semester ended in June.



Izzy who had come to PA for the weekend was with me 4 hours away from Julia.  Izzy jumped into action and drove home to Julia.  ███████████

███████████████████████████████████

███████████████████████████████████.

Izzy will never forgive himself for what Julia has gone though and continues to go through.  Her suffering is due to this case.  He blames himself and beats himself up daily.  The rest of the Summer, Izzy spent mostly at home caring for Julia; making sure she was safe and eating properly.

████████████████████████████████████

██████████████. Julia would be devastated if her father would be taken away from her.  She has a beautiful close relationship with him and I worry a lot about that.  (Ex. T)

Rabbi David Milston is the Principal of Midreshet HaRova in Jerusalem where Julia attended school.  In his letter to this Court,  Rabbi Milston recalls the day that Julia learned of her father's arrest, "she was in deep shock, and had a very difficult time dealing with the arrest and the possible ramifications therein.  For most of the year Julia was unable to sleep well at night, and as a student she could hardly function." (Ex. W)

Atara Starr was one of Julia's teachers and mentors during her year of study in Jerusalem.  She met Julia in September 2021 just prior to Julia learning

of her father's arrest.  Ms. Starr describes Julia's slow deterioration over the

ensuing 10 months:

> From the time Julia found out about her father's case
> she began to develop severe anxiety that led her to have
> panic attacks. At first they were infrequent and
> "bearable" but by May 2022 she was having numerous
> intense panic attacks a day, she cou1d barely sleep at
> night and she became depressed. Julia would often
> avoid spending time with her friends as the pressure of
> what was going on at home seeped into her very being
> and the normal social life of a 19 year old suddenly
> seemed quite irrelevant and exhausting. Julia spent
> many evenings in my home when she felt she could not
> be in the social setting that our program offered her and
> I sat by her side holding her through many panic attacks
> as well as calming her from nightmares about her
> father's sentencing when she would fall asleep on my
> couch. . . .
>
> Julia's fear of being abandoned by her father became so
> ███████████████████████████████████████████
> ███████████████████████████████████████████
> ███████████████████████████████████████████
> ███████████████████████████████████████████
> ███████████████████████████████████████████
> ███████████████████████████████████████████
> ████████████████████ (Ex. X)

Dr. Penina Zilberberg, Ph.D. ████████████████████████████████ since

June of 2022, for among other things, ████████████████████████████████

████████████████████████████ ▌ In her letter to Your Honor, Dr. Zilberberg

_____

[16] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████ ████ ████████████████████████████████████████
20350950

opines that Marc Elefant's presence in the home provides the irreplaceable stability that Julia needs to get better and believes that without him Julia might otherwise regress and her recovery would be impeded. Dr. Zilberberg asks Your Honor to show leniency in sentencing for Julia's sake:



> I am writing to you to request leniency in the sentencing of Marc Elefant. I've been treating his daughter, █████
>
> ██████████████████████████████████
> ██████████████████████████████████
> ██████████████████████████████████
> ██████████████████████████████████
> ██████████████████████████████████
> ██████████████████████████████████
> ██████████████████████████████████
> ████████████████
>
> Throughout her treatment, her parents have been a strong source of support for her. Her father, Marc Elefant, has been actively involved and supportive in Julia's treatment, and has supplied much needed emotional support and stability for her. The consistent stability provided by her parents have been pivotal for her progress. Julia's symptoms began last year while she was studying abroad, away from her family. Now that she is back, she has been able to work on her issues, to the point of stabilization, while getting needed support from her parents. <u>Mr. Elefant's presence in her life has been integral, and I am concerned for what could happen to her emotional stability if that support were to be withdrawn and absent from her life for any lengthy period of time.</u> ████████
>
> ██████████████████████████████████ <u>His physical presence in her life is crucial for her emotional stability at this time.</u> (Ex. Y). (emphasis added)

Julia's extraordinary deterioration has been apparent to Marc and Karen's friends. Danielle and Ari Witkes have known the Elefants for over 25 years. Ms. Witkes was a special education teacher and has since returned to school to

practice in psychology.  Ari Witkes is an Athletics Director for a prestigious private school in Manhattan.

Ms. Witkes has noted from a professional perspective the corrosive impact Mr. Elefant's conduct and its prosecution have had on ███████████

███████████████████████████████████████████████████████████

████████  Ms. Witkes writes to Your Honor as follows:

> Julia currently attends NYU Stern School of Business.  The academic standards there are superior to most schools, and the expectation to perform to that degree of excellence requires ambition, determination, tenacity, time management skills, and a whole lot of mental energy. ██████████████████████
> ████████████████████████████████████████. This entire ordeal has been very traumatic for Julia, ██████████
> ██████████████████████████████. ██████████
> ████████████████████████████████████████
> ████████  This program takes up a lot of her time, time which is needed for studying and doing homework. █████████████
> ████████████████████████████████████████
> ████████████████████████████████████████
> ████████████████████████████████████████
> ████████████████████████ (Ex. Z)

No one feels more guilt for Julia's serious psychological issues than her father.  Good parents try to live their lives daily for one reason – their children.  Marc Elefant has done that. But his lapse in judgment in this case has torn much of that asunder.  It takes years, often a lifetime, to build a home and mere seconds to tear it down. Marc writes:

> Julia turns 20 next month and is a sophomore at NYU Stern School of Business in New York. Julia is a smart, funny hard working young lady who has always excelled in whatever she puts her mind to.  She was  a top student and athlete in

High school that received many academic honors and was MVP of her basketball championship game in 10th grade. When Julia graduated high school in 2021 and headed to Israel for her gap year of study, things couldn't have been going better for her. She had graduated with honors and was eventually going to attend the college of her choice when she came back from Israel. It was an exciting time for her, and it all came crashing down 4 days after she arrived in Israel when Karen had to call her and advise her of my arrest.

My indictment had a dramatic effect on Julia. I know my wife Karen is going to share the details of situation in her letter so I will just say that what was supposed to be a special year of growth and study ████████████████████ ████████████████████ Knowing that I was the cause of all that trauma is something I will never be able to forgive myself for. The ultimate low point came in the Summer ████████████████████████████████████ ██████████████████████████████. That was truly the worst day of my life.

████████████████████████████ that she is dealing with as she attends College. It's been a slow progression and I fear that any time away from Julia will send her in the wrong direction. Your Honor, please consider her when making your decision. Her - not me. It breaks my heart that I even have to ask. (Ex. B)

### iii. **Grace Elefant**

Only one year after Julia was born, Karen began exhibiting undiagnosed vertigo- type symptoms. Eventually, doctors concluded that she suffered from a condition known as POTS (Post Orthostatic Tachycardia Syndrome) which causes an imbalance in the nervous system. Karen also suffers from Celiac disease. (PSR ¶ 71). After almost three years of searching, Karen was finally placed on the proper medications. Doctors, however, cautioned that she should not conceive another child. Grace was thus born through a surrogate seven years after Julia's birth.

Karen Elefant recalls those difficult days and how her husband took on the

parental obligations:

> When Julia turned one years old, I awoke from my sleep extremely dizzy.  This marked the beginning of a three year period where until this ordeal was the worst time of my life.  I spent three years going to doctors and undergoing tests to determine what was causing my symptoms.  I had little to no energy, my brain felt foggy and at times I was seeing double.  Izzy and I drove to a specialist in Ohio on two separate occasions to try and get to the bottom of what was going on with my health.  Izzy didn't miss a beat in those three years.  He became mother and father to the children during this time.  He got up with kids in the middle of the night and took upon himself many of the parental roles that we used to share.  I still look back in awe of how he got it done without any complaints.

> After a very difficult three years I was finally diagnosed with POTS (postural orthostatic tachycardia syndrome)  and Celiac disease.  POTS  is an autoimmune disease that causes the heart to race and blood pressure to drop upon standing.  One of the common effects of POTS is Vertigo.  When this occurs, am I unable to get up from laying position. Another symptom is to have a vasovagal reaction, which includes dizziness, intense sweating and the inability to stand up.  This most frequently occurs when I am under stress or am abruptly awoken from my sleep.

> After a long three years, I was prescribed numerous medications to control my POTS.  For the past 9 years while my medication had been helpful.  I have had a number of relapses from my POTS.  As a result, my doctor advised against carrying any additional children.  Izzy & I knew we wanted more children and made the decision to have our third child, Grace with the assistance of a surrogate. (Ex. T)

Unfortunately, Karen's disease is not yet cured and only generally controlled.

Since stress instigates the disease's symptoms, it has returned from time to time

since 2017 with a vengeance. Indeed, as recently as this winter, Karen fainted

from a POTS induced episode. (PSR ¶ 74)[17]

---

[17] The PSR states that Karen fainted in November of 2022.  It was October of 2022.

During those times, Karen simply cannot care for Grace alone and describes

the critical role Marc plays in caring for the family:

> Ever since we learned about the investigation in 2017, my
> POTS has been flaring up.  When my body has these
> reactions, it is quite scary.  Izzy is always by my side until
> the symptoms subside.  This past year and half I have
> endured more stress than can be handled by a perfectly
> healthy person.  I worry 24 hours a day about my children's
> wellbeing during this unimaginable time.  I worry for their
> mental health, and because I cannot financially support them
> alone. I have so much fear and anxiety that my POTS has
> gotten worse.  For example, the morning the FBI came and
> woke us up at 6:00am, I went downstairs not being able to
> fully see the FBI agents (a precursors to a POTS attack) I saw
> blurry figures and followed their instructions.  They led me,
> Max, and Grace to our front walkway.  I was having
> difficulty standing and told the agent that I needed to lie
> down.  She instructed me to lay down in the walkway.  I laid
> down on the cement with my left side of my face in the grass,
> sweat dripping and feeling faint while grace, who was
> terrified, continued to ask me what was going on. More
> recently, (Oct 2022) the week that Izzy pled guilty, as I got
> out of bed in the middle of the night, I fainted.  Although this
> is a common reaction to POTS, it is very concerning. Your
> Honor, I cannot do this alone . . .
>
> Izzy's most vital role in life is that of a father to our three
> precious children. . . .  (Ex. T)

Marc's mother confirms that Karen's medical condition remains episodic and

she relies heavily on Marc for "many daily parenting responsibilities, especially

for Grace." (Ex. C)

Bernice Rotter, Karen's aunt, is also concerned that Karen's health issues

impair her ability to care for the children, particularly Grace, without Marc's

help.  Ms. Rotter writes:

> When my sister [Aviva Mann] was diagnosed with her latest
> bout of cancer, Izzy's position in the family became even
> more critical.  He is the rock upon which Karen, my sister's
> daughter, leans.  Karen, although frantic, someone must

muster the strength with which to reassure her children about their beloved grandmother.  She can't do this alone.  (Ex. AA)

### iv. Mr. Elefant Provides Indispensable Care for His Daughter Grace Who Suffers From Extreme Separation Anxiety.

Grace is 7 years younger than Julia and  almost 10 years younger than Max.  So, although the siblings remain close, Grace's relationship with her parents is in many ways like that of an only child.

███████████████████████████████ since Hurricane Sandy. Subsequent events, including her father's arrest, have exacerbated her condition.[18] Marc knows that he has only himself to blame, but is rightfully concerned, given how close he is with Grace, that his absence from the home will have a severe impact on her mental health:

> Grace is twelve years old and attends 7th grade in a local Hebrew school in Woodmere called HAFTR (Hebrew Academy of Five Towns & Rockaway).  She is a sweet and precious soul that loves to sing in the shower and play with her friends. She hears everything that goes on in the house and can be so spontaneously funny that she will have you

---

[18]    In May of 2017, after Mr. Elefant and counsel became aware of the instant investigation, counsel requested from the government to be advised if Mr. Elefant's status changed from subject to target and to allow Mr. Elefant to surrender.  Counsel explained that Mr. Elefant was not a risk of flight; not dangerous; and had substantial roots in the community.  Counsel also cautioned the government that Mr. Elefant had a gun permit and young children living at home and was concerned for their well-being if a team of FBI agents showed up guns drawn, at 6:00 a.m.  Counsel was told the request would be taken under advisement. Unfortunately, four years later, Mr. Elefant was arrested at his home for no apparent good reason other than his public shaming and the FBI's arrest statistics. Grace, who was ordered down from her bedroom, remains traumatized.  Ironically, any defendant who was not at home when the FBI arrived was allowed to surrender. The decision to effect these types of arrests, which we understand is left up to the discretion of the FBI, has been severely criticized. *See generally,* https://www.abajournal.com/web/article/perp-walk-white-collar-arrests.

46

laughing until you cry.

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████  ████████████████████████████ We
have worked hard with her to build her confidence and get
her to a good space.  We even kept some of the details about
my case from her until recently so that she would not have to
worry or be afraid for a longer period than necessary.

Grace is terrified about the unknown future.  She is worried
about me and about the possibility that she will have to be
separated from me.  I've always been a hands-on dad, helping
with feedings, homework, and nighttime duty tucking my
kids into bed, but for Grace its ten times  that.  I am the one
that talks with her every night before bed about her day and
what is to come tomorrow.  I put her to sleep and wake her
in the morning.  I make her breakfast, lunch and drive her to
school.   I am torn to pieces inside that my actions are
responsible for our possible separation.  (Ex. B).

Karen Elefant further describes ████████████████████████████

and the extraordinarily close relationship she has with Marc:

Grace is now 12 years old.  She is the most dependent on
Izzy.  ██████████████████████████████████████
███████. ██████████████████████████████
                                              She
was in pre-school at the time and her teachers were quite
concerned about her anxious behavior. Then a few years
later, Grace's school had a fire overnight and her class was
relocated for several months.  ████████████████████
████████ and she refused to have play dates at friend's houses
and would not let us leave the house (even for 10 minutes)
without her as she was terrified something would happen to
us.  When Izzy and I learned about the investigation almost
6 years ago, she picked up on our conversations.  ████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

 Izzy
tucks Grace into bed every night and they discuss their day.
Izzy wakes her up every morning, gives her breakfast, makes
her lunch and takes her to school.  Izzy and Grace watch
movies together.  He drives her everywhere she needs to go
as well as driving her carpool to basketball and bat mitzvahs.
Izzy made up a song for her and sings it loud as he walks past
her bedroom as a hello.  Grace is a sensitive and sweet girl
that prays every night on her own for our family to be healthy
and happy.  Grace has been completely devastated and
absolutely petrified since the arrest.  As a mother I am
terrified to have to give her any more bad news.  (Ex. T)

Marc Elefant's brother-in-law, Stephen Levy, is profoundly concerned

about Grace, who is at "a crucial stage in her development as a young teenager

and has suffered for years before the legal issues ███████████████████

███████████████████████████████  I fear for Grace should Izzy be

separated . . . "  (Ex. BB)

Jennifer Mandel has known the Elefants for over 30 years.  She has

witnessed Marc's close relationship with his children, particularly with Grace,

and is troubled about the impact of Marc's sentencing and possible separation

from Grace:

My family became closer with the Elefant family over the
past 10 years since our daughters are the same age and are

very good friends. During that time, I have observed Izzy to be an extremely devoted father and dedicated husband. Izzy consistently makes himself available to drive carpools, hosts playdates and cares for his children's needs. He takes great pride in their achievements, encourages them to pursue their dreams, and supports them in all their endeavors, whether it be basketball, music or a dance recital.

Izzy has truly been a rock for his family. In particular, I have observed his relationship with his daughter, Grace, who is the same age as my daughter.  I have witnessed firsthand how much Grace depends on Izzy for support and encouragement to overcome her anxiety. His supportive and reassuring presence is essential for ▇▇▇▇▇▇▇▇▇▇▇▇▇▇. I am concerned that if Izzy is not home, Grace's anxiety will worsen, and it will be even more difficult to make any improvement. Izzy's family needs him at home. His presence is not only essential for Grace, but for his entire family. His absence would have a significant impact on all his children, Grace, Julia and Max. (Ex. CC)

Julia Elefant, who, as discussed earlier, is experiencing her own serious emotional and physical trauma, describes Grace's closeness with their father and her grave concerns for what Grace is going through:

I've expressed the way that I was and continue to be affected by this whole situation. But I now want to express how my little sister will be affected by my father's absence. My sister relies on my father probably more than my brother and I do combined. She hugs him every time he walks into a room and screams "love you, bye" at least three times before he leaves the house. Just three months ago, my father came to help me move into college and my sister remained on the phone with us for nearly three hours because she missed him. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ to both of my parents began years ago and still clearly continues to affect her daily life. Not only does she struggle to have overnight

sleepovers with friends, but she also struggles to even go to my grandparents' house for a few hours without my parents. As I'm writing this letter, she isn't yet aware that my father is facing possible prison time. But I think out of all the unknowns and all the fears I have surrounding this whole situation, the way my sister will react and struggle if my dad goes to jail is the biggest one on my mind. As a result of the mental ramifications of my father's case, I was forced to grow up way faster than I should have had to. We are all so very worried about the impact on my sister. She deserves a father with her just as we did. (Ex. V)

Grace has also written to the Court.  As a 12 year old it is sadly clear that she does not appreciate the enormity of the problem her father is facing or that he may be imprisoned.  What is apparent is the special relationship she shares with her father.  Her short letter is quoted below in full:

Dear Judge Stein:

My name is Grace Elefant, and I am the 12-year-old daughter of Marc Elefant.

My daddy is the most special person. He's always making me laugh with his weird dad jokes that no one gets. He always makes me feel safe and protected.

I sometimes have fears and get scared about things that might happen and my dad is the best at calming me down and showing me that I don't need to be afraid.

He is the one who wakes me up, gives me breakfast and drives me to school almost every day. It's a special time he has with me alone that I look forward to each morning.

My dad and I have a running joke about how he's always asking me to watch TV or a movie with him and I always so No!  I mean that's weird right?  Sometimes I give in because I feel bad for him.

At nighttime I tend to get nervous and worry about different sounds I hear in the house. My dad is there right next to me, super calm and he shows me that it's the heating system, or the dishwasher, or something else and I relax. He is so patient and calming that it makes me feel better.

At bedtime, my dad tucks me in, and we chat for a little about

our days.  I love it so much.

My dad is a very nice and kind person to everyone.  (Ex. DD)

Jordan Rinzler and his wife, Suri, have been close neighbors, almost like family, to the Elefants for over 10 years.  Jordan describes in his letter to this Court Grace's attachment to her father:

> Grace in particular holds a special place in our hearts ,incl our homes. We have literally watched her grow up with our 3 younger children, as a peer to our son and a big sister to our twin daughters.  It is not a forced friendship among neighbors, the kids are  family to one another. Seeing Grace over the years, it is obvious that she is especially attached to Izzy. I've seen her attachment in person when she would come over to play with my kids not 100 feet from her house.  It was never more clear to me in the Summer of 2020 when she returned home from sleep away camp after 5 day (sic).  Not having Izzy around would have a negative impact on her academics, her social development, and her mental health.  ( E x . EE )

Danielle Witkes, is a close friend of the Elefant family and is a recently licensed psychologist. She provides to Your Honor her perspective on a Grace's emotional condition and her relationship with her family - specifically with her father:

> Grace has had anxiety for many years, and her single foremost consolation is having her family together.  She has an extreme fear of being home alone, and the way that Izzy and Karen manage this issue is by always having one of them home with her no matter what. If one of them has an obligation or commitment somewhere, the other stays home.  If both must be somewhere, it becomes a major challenge to have one of their older children available to stay with Grace. When Grace has trouble sleeping, Izzy will remain with her during the night so that Karen can attempt

to sleep, and he will even watch movies throughout the night
if that's what it takes to give Grace a sense of security and
protection.  It's hard to imagine what would happen if this
powerful bond that Grace has with Izzy were to be severed.
I fear that her level of distress will cause her to be so
overwhelmed, that her already fragile existence will be
further shattered.  ████████████  ██████  ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████  (Ex. Z)

Marc Elefant's mother-in-law, Aviva Mann, writes that Grace is a
"beautiful, smart, loving, and special girl who has major fears and anxieties . .
. She is not able to remain alone at home, even for ten minutes."  Ms. Mann,
now age 74, and formerly a registered nurse, was recently diagnosed with
cancer and is undergoing chemotherapy.  She laments that she can no longer
help Karen should she be needed.  (Ex. F)

Neil Mordowitz has been with Bloomberg LP for 23 years as a systems
manager.  His family has become very close with the Elefants and his daughter
is very close with Grace. Mr. Mordowitz has observed ████████████████

████████████████████████and pleads that Your Honor consider her
emotional state when imposing sentence on her father:

> lzzy's youngest daughter, Grace, who is 12 years old, has
> become a best friend/sister of my youngest daughter. They
> have spent many weekends hanging out, Grace taught my
> daughter how to ride a bike and in general has been a role
> model for our child.
>
> Grace needs a Father in her life. Having gotten to know
> Grace, ████████████████████████. Grace's

first stint at a summer sleepaway camp (that is supposed to last for 7 weeks) lasted for 2 nights, prior to "Izzy" being called that she was being sent home. She was not able to be away from her parents, just that small time being away had grossly impacted her ███████████████████████████████.
I shudder at the thought of her having to spend a much longer time away from her father. Furthermore, the loss of her father may extinguish the fire of happiness that exists in a child that age and would negatively impact her growth as she ages through anytime that "Izzy" may not be with her.

Honorable Judge Stein, I do not know Marc "1zzy" Elefant for many years, but, although we have only known each other these 7 short years, having been his neighbor you learn a lot about someone's character, being, and selflessness. His character is impeccable, understanding, involving, and someone who I would never have expected to have fallen into this situation. We implore you to consider who he is, what he means to the community, and what he means to us, his friends and neighbors, when you are making your decision. I beseech your honor to take all this into consideration when handing down as light a sentence as possible. (Ex. FF)

Sara Reichman, Ph.D., ███████████████████████████████████

████████████████████ Karen and Marc generally attend the therapy sessions. ██████

████████████████████████████████████████████████████████

███████████████████████

███████████████████████████████████████████
███████████████████████  ████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████



### E. Marc Elefant's Family Responsibilities Alone Warrant a Non-Prison Sentence.

Marc Elefant's greatest fear when he stands before this Court for the imposition of sentence is least about himself and mostly about the impact on his family. His f a m i l y responsibilities for his children and his wife and the tremendous suffering they will endure in his absence weigh very heavily on him. In determining the appropriate sentence to be imposed on this, and any defendant, a sentencing court must consider any pertinent policy statement. 18 U.S.C. § 3553(a)(5). Although we move for a variance only pursuant to § 3553(a), it is noteworthy that even pre-*Booker,* where the much higher burden of extraordinary circumstances was required to justify a reduced sentence, a downward departure based upon the loss of a defendant's role in the family's caretaking was still appropriate where:

- …service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking … to the defendant's family;
- The loss of caretaking … substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant;
- The loss of caretaking … is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking … irreplaceable to the defendant's family; and
- The departure effectively will address the loss of caretaking. Application Notes 1(B) (i-iv) to U.S.S.G. § 5H1.6.

The Second Circuit explained that a downward departure for extraordinary family circumstances is not based upon a defendant's decreased culpability, but on the Court's "reluctance to wreak extraordinary destruction on dependents who rely on them for their care". *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992); *See also United States v. Adams*, 2017 WL 2615440 (E.D.N.Y June 16, 2017) (citing *United States v. Johnson)*; *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) (affirming downward departure where defendant's imprisonment would harm adult relatives needing special care and might result in destruction of family unit); *United States v. Dominguez*, 296 F.3d 192, 198 (3d Cir. 2002) ("appropriate—indeed, essential" for a District Court to consider the impact of a defendant's family circumstances on the purposes underlying sentencing.); *United States v. Sweeting*, 213 F.3d 95 (3d Cir. 2000); *United States v. Galante,* 111 F.3d 1029, 1035 (2d Cir. 1997) (affirming 13-level downward departure from guideline range of 46 to 57 months to sentence of five years supervised release where "removal of the father from this unit at this particular point in time would have a disastrous effect on the children in terms of their education and upbringing." )

Where, as here, one parent is critical to a special-needs child's well-being, and that child is "very attached and close to his father," those facts qualify as exceptional circumstances justifying a downward departure. *See, e.g., United States v. Spero*, 382 F.3d 803, 804-05 (8th Cir. 2004) (exceptional circumstances for downward departure where defendant was critical to the routine and continued well-being of his child with developmental and mental disorders);

*United States v. Jebara*, 313 F. Supp. 2d 912, 918 (E.D. Wis. 2004) (granting downward departure in form of split sentence with 5 months imprisonment; "Given its financial and child care demands, this family is precariously balanced, and defendant is the fulcrum. The family would suffer a substantial loss of essential caretaking if [defendant] were imprisoned under the guidelines").

The case of *United States v. Lehrmann*, 513 F.3d 805 (8th Cir. 2008) is particularly instructive. In that case, the court affirmed a variance and a sentence of probation with six months community confinement from an advisory sentencing guidelines range of 37 to 46 months' imprisonment. Lehrmann argued that her son's disabilities required her day-to-day involvement in his care and development, and that her son's father, despite his long-time role as either the primary or joint custodial parent, was not in a position to provide the necessary care and emotional support. The court found "particularly compelling" the testimony of their son's psychologist who opined that their son was likely to "decompensate emotionally," and suffer a setback in his overall development if his mother were removed from his life. The district court stated "the one thing that guides me more than ever is I do not want this young boy to suffer any more, "and concluded that this was "an extraordinary, exceptional situation…." Reviewing the § 3553(a)(2) factors, the court found that incarceration was not a necessary punishment. "Does she need prison time to have the appropriate punishment? I just can't see where that serves any purpose for additional punishment."

In sum, based upon the harsh impact incarceration would have on Marc's

daughters, and the fact that the care he provides to them is both essential and irreplaceable, paraphrasing the *Lehrmann* Court, we ask "does he need prison time to have the appropriate punishment?" We implore Your Honor that he does not.

### F. Mr. Elefant's Charitable Hands-On Involvement in the Community Alone Warrants a Significant Variance.

Mr. Elefant's family and friends have written letters to Your Honor attesting to Marc's humanity and indefatigable work on behalf of the community. Marc has long dedicated his time and resources to those in need. Post-*Booker*, a defendant's history of charitable activities should be considered as one of the factors appropriate in imposing a variance under the advisory guidelines. *See Rita*, 127 S. Ct. at 2473 (Stevens, J., concurring) ("Matters such as . . . charitable, or public service are … matters that § 3553(a) authorizes the sentencing judge to consider.") Notably, several courts have granted a defendant a variance (or downward departure) based on the defendant's charitable acts or good works. *See United States v. Washington,* 233 F.3d 773 (6th Cir. 2009)(defendant convicted of money laundering and fraud regarding school programs given substantial variance for charitable works despite being organizer of the criminal conduct); *United States v. Serafini*, 233 F.3d 758, 773, 774 (3d Cir. 2000) (downward departure upheld where many of the letters supporting Serafini, an elected official, "contain[ed] substantive descriptions of Serafini's generosity with his time as well as his money.")

As *Serafini* and other cases make clear, whether it is categorized as a downward departure or a non-guidelines variance based on 18 U.S.C. § 3553(a), good works towards others remains a vital factor for a sentencing court to consider. Indeed, in the case of *United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009), the defendant pleaded guilty to a fraudulent scheme to evade taxes in violation of 26 U.S.C. § 7201. Tomko admitted that over the course of two years, he directed that 12 subcontractors and his general contractor falsify their billing invoices to make it appear their work had been done for his construction company rather than for him individually, at his personal residence. The scheme resulted in a tax deficiency of $228,557.00 with a guideline level of 13. Over strenuous objection by the Government, the District Court determined that Tomko's lack of any significant criminal history [Tomko had a prior DUI], his involvement in exceptionable charitable work and community activity, and his acceptance of responsibility warranted a variance and imposed a sentence of 250 hours of community service, three years of probation, one year of house arrest, and a $250,000 fine. *Id.* at 563-64.

On appeal, the Third Circuit rejected the Government's arguments that the sentence was unreasonably low and held that the district court's variance based on the defendant's charitable acts was appropriate. *Id.* at 572-573. The *Tomko* court also noted that even pre-*Booker*, a defendant's charitable acts were an appropriate measure for a downward departure. *Id.* at 573. *See also United States v. Fred E. Cooper,* 394 F.3d 172, 176-78 (3d. Cir. 2005) (where defendant pleaded guilty to securities fraud and tax fraud, downward departure from 15-21

months to three years of probation based upon "good works that were of a personal nature" was warranted.)

In *United States v. Robinson,* 2014 U.S. Dist. LEXIS 48944; 2014 WL 1400197 (Dist. of N.J. April 9, 2014), three brothers were convicted by plea of failing to file individual tax returns from 2005-2008.  The defendants also used check cashing services to deliberately conceal over $1.5 million in income from the U.S. Treasury. The district court granted the defendants a variance from 18-24 months incarceration to three years of probation, 400 hours of community service and three months of home confinement based on their charitable work and strong family values and family support. *Id.*  at **2-3;  9;  17. The Third Circuit, citing to *Tomko¸* found the variance to be reasonable.  Significantly, the Court rejected as "misleading" the Government's characterization of the variance to probation as "'massive,'" finding that it in fact was "not substantial". *Id.*  at *14-15. *See also, United States v. Thurston,* 544 F.3d 22, 26 (1st Cir. 2008) (affirming a sentence of three months incarceration and 24 months supervised release from a recommended guideline sentence of 60 months' imprisonment based in part on the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *United States v. Ali,* 508 F.3d 136, 150 at n.19 (3d Cir 2007) (upholding downward departure where the defendant, *inter alia,* "helped organize fundraising banquets for the [school where she worked], contributed her 'personal assistance from leading to scrubbing floors,' spent several hours 'counseling and comforting' a student's parent who was struggling to

overcome drug-addiction, and became the 'legal guardian' to two nieces to ensure that they attended better schools." (record citation omitted); *United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998) (upholding defendant's downward departure for charitable activities, which included bringing two troubled  young women into her home and paying for them to attend a private high school, as well as helping to care for an elderly friend.)

Tellingly, many of the courts that have addressed a defendant's good works have recognized that the defendant's contribution of his time and energy is more valuable than simply his monetary contributions. *See, e.g., Tomko*, 562 F.3d at 572 (describing how the defendant's "charitable acts that involved not only money, but also his personal time."); *Cooper*, *supra,* 394 F.3d at 177 (noting that personal sacrifices "are qualitatively different from the detached donation of money"); *Serafini, supra,* 233 F.3d at 775 (noting that Serafini's contributions "weren't acts of just giving money, they were acts of giving time, of giving oneself").

Mr. Elefant's  charitable endeavors have always been focused on hands-on work. Moreover, Marc is not someone who only recently became "charitable" after being charged in an effort (albeit still commendable) to reduce his sentence. As established *infra,* by so many of Marc's friends and colleagues, his altruism and dedication to the community and others has been an important part of his life for many years.

### i.    Marc Elefant's Extraordinary Dedication And Devotion to the Community.

Most people go through life focusing solely on their own needs or the

needs of their family.  "Charity begins at home and ends at home" is the calling card for too people. But that is not how Marc Elefant has lived his life. Despite his long day as a lawyer; a father caring for his kids; and a devoted husband helping his wife when she is need of rest; Marc has dedicated literally countless hours to the 250 families and their 500 children who attend the Irving Place Minyan ("IPM") synagogue and to the community at large.  At IPM, Marc has performed every function: Trustee; President; chairperson of various committees, including Rituals, Security, Fundraising, and Bereavement (focusing on members dealing with death in their families).

Dozens and dozens of people have written from the heart letters to Your Honor on Marc's behalf explaining his positive impact on the community. Each letter is important.  However, a prime example of Marc Elefant's compassion for those in need is the kindness and humanity he showed to Bernardo Jaquez, the maintenance worker at the Children of Israel Congregation in Woodmere where IPM was a tenant.[19] Five days a week, Mr. Jaquez woke up at 5:00 a.m. and travelled almost three hours daily from his home in the Bronx to be at work. In or about 2014 or 2015, Mr. Jaquez met Marc and they soon became friends. Marc treated Mr. Jaquez with "kindness and respect" and helped him to clean up after religious services. Without any prompting, Marc reached out to Mr. Jaquez's boss at Children of Israel and convinced him to allow Mr. Jaquez to work for IPM on Saturdays so he could increase his salary. Again, unprompted, Marc convinced the Sons of Israel to allow Mr. Jaquez to move his family from the

---

[19] Mr. Jaquez participated in the video presentation which is part of this submission.

Bronx into a vacant apartment in the synagogue building. As a result, Mr. Jaquez no longer has a three hour commute each way; he saves on rent; and most importantly, his son, who has special needs, attends public school in Hewlett in one of the "best school districts in New York." According to Mr. Jaquez, "[t]he impact this has had on my son and wife is beyond explanation." Marc, Mr. Jaquez writes, is "my friend and has always encouraged me to keep going." (Ex. HH) Marc's act of compassion for Mr. Jaquez reflects the true person that Marc is and explains why so many people wanted to write a letter to this Court on his behalf.

The letter from Adam Z. Karkowsky is a powerful example of a person who had strong reason <u>not</u> to write a letter to Your Honor on Marc's behalf requesting leniency but still did so because he knows that Marc's misconduct was an aberration not indicative of the compassionate, genuine, and honest person he really is.

Mr. Karkowsky has known Mr. Elefant for thirty years. Like his father, Mr. Karkowsky is an attorney by education, having graduated Georgetown Law School, and was "raised both from a professional and personal perspective with a deep respect for the law and the institutions that enforce and protect it." (Ex. II) Mr. Karkowsky is also the President of AmTrust Financial Services, Inc., one of the largest property and casualty insurance companies  - and most importantly, <u>a victim of the fraud committed in this case.</u>

Mr. Karkowksy made clear that his decision to write to this Court on Marc's behalf asking that a non-prison sentence be imposed, was neither

impulsive nor intended to "diminish the import of the prosecution. . . "
Eventually, however, he concluded that the Marc Elefant he has known for 30
years, who has shown utter remorse and taken responsibility for his behavior,
must not be judged solely by his misconduct:

> Since learning of Marc's arrest, I have fought my own
> internal battle. I have tried to reconcile the allegations with
> the person I know so well for so long with the person that I
> know to be honest and full of integrity. With my very
> personal struggle of whether I can stand behind my friend
> who is accused of victimizing my company and my peers. I
> did not come to writing this support letter lightly. I have
> wrestled with the right thing to do here. I chose this path
> because I know that Marc has taken responsibility for his
> actions, and I believe he has already paid an enormous price
> for what he has done. I know that he is a kind and thoughtful
> man that will live the rest of his life trying to rebuild his
> reputation and his family, making sure that he never hurts
> anyone else ever again. I know that it is inconsistent with
> Marc's character to be intentionally involved in anything that
> would physically harm another person and so I am confident
> in my decision. *Id.*

Mr. Karkowsky knows Marc Elefant as a "genuine" person always
available to provide advice and guidance; a man of "action, giving his time and
manual labor in support of the community"; and as a "wonderful father and a
role model for me." Mr. Karkowksy has called Marc for legal advice related to
the insurance industry and received honest answers that were often "contrary to
his [Marc's] own best interests. Most importantly, I found him to be honest and
thoughtful about everything we discussed and never gleaned even a hint of
illegality in any of his approaches to representing plaintiffs." *Id.* Last, Mr.
Karkowsky knows firsthand the integral part Marc plays daily in the lives of his
family and how they will

> suffer every minute that he isn't home . . . I believe that the Marc Elefant I have known for more than 3 decades, a man of excellent character and integrity, is the real Marc, and one that we all can rely on to carry forward.  I humbly request that you take all of this into account and have compassion on Marc and hand down as light a sentence as possible. *Id.*

Rabbi Aaron Feigenbaum was the Rabbi of the IPM from August 2016 through August 2022.  He writes to the Court about Marc's total dedication for the diversity of community matters, including obtaining funds to help with substance abuse; teens at risk; and for synagogue security after the Tree of Life murders:

> Izzy became the president of the synagogue board in 2018 and served in that role for two years until 2020. In those two years we worked together constantly on communal affairs. In this time period Izzy spent countless hours with me tending to the needs of others. We set up services for prayer, organized charity fundraisers, ran events for the community's youth, coordinated learning sessions for the synagogue, and represented our community to local government and emergency first responders. In addition to these events we spent countless hours helping individual members of our community with personal issues, assisting local schools with their events and fundraising, as well as supporting local non for profit organizations helping our community deal with mental health, teens at risk, substance abuse etc.
>
> Izzy took on added responsibility for the community in late 2018 after an anti-Semitic attack left eleven Jews dead in a shooting at the Tree of Life Congregation in Pittsburgh, PA. I recall that our community, like many other Jewish communities, was scared. Izzy and I attended a meeting with the local police department and they told us that they would be on high alert and that we should be on high alert. Izzy took initiative and began a security committee for our synagogue. He organized volunteers, attended security trainings, and coordinated with local PD to set up systems whereby we could feel safe returning to synagogue.

All of this he did as a volunteer. He received no compensation for his efforts, on the contrary it required great sacrifice of time and effort, and I was witness to much grief and aggravation that he received from others as a result of our efforts to assist and support our community. Our community was certainly enhanced and uplifted by the many hours of dedication and good deeds that Izzy volunteered on its behalf. (Ex. JJ)

Benjamin Chesir is a Senior Compliance Office at Goldman Sachs with responsibility for the firm's Conduct and Integrity Program. He has been Marc's friend for over 15 years. Mr. Chesir describes Marc's dedication to the community, and recounts his act of bravery when a child fell into the rapids during a temple excursion:

While most consider Saturday a day of rest and relaxation, Marc can be typically found coordinating the synagogue's security detail, overseeing the setup and distribution of hot meals, managing youth program staff, welcoming guests and new members, planning events and assisting the rabbinical staff with special projects. He also does so quietly and with humility always accepting the help, input and ideas others may have to contribute. In meetings he is the peacemaker and consensus builder. . . . While the most profound impact to his sentence will no doubt be his loving family I can attest to the hundreds of our synagogue's men, women and children who look to him and up to him on a weekly basis.

One personal anecdote comes to mind when trying to sum up Marc's character. Several years ago we had the pleasure of going camping with several families including the Elefants. Marc naturally took the role of "Captain" making sure that each detail was addressed and each child was happy, comfortable and safe. . . One of those days we partook in a rafting trip and due to heavy rains in the day's prior, the Delaware rapids were running high and fast. At one point a young boy in another raft fell into the water and without thought or hesitation, Marc, who was in another raft further away from other adults, immediately jumped in, swam against the rocky current

to make sure the child was safe before others could even react. At the end of the rafting trip he was the first one back at the campsite preparing dinner and activities for the group. (Ex. KK)

Rabbi Ilan Ginian, MSW, CASAC, CH (CAPT), USAR, is one of Marc's longtime friends. Rabbi Ginian is a reserve Chaplain in the U.S. Military, a social worker, and a certified substance abuse counselor. He has also built drop-in centers throughout New York City and GED programs for teens at risk on Long Island.

He writes of Marc:

> When I heard about Marc's guilty plea, I was heartbroken. Marc has always taken an interest in the work I do for others and offers to assist at any moment of need. This reflects the caring and sensitive nature of Marc. There are those that need to be convinced to take note of the plight of another. Not Marc. This comes natural to him and cannot be sidelined when an individual or community need arises. He is known throughout the community as a man that can be relied upon for any task and is a faithful friend, parent, and husband. (Ex. LL)

Jason Meyer is in the real estate business and has made Marc his partner in a small management company in Albany that caters to low income families. Mr. Meyer writes about the pride he felt seeing firsthand the "compassion [Marc] had for our tenants . . . he went to bat for tenants . . . and delayed any evictions, even before the government instituted a [Covid-19] moratorium. He always treated the tenants with the utmost respect . . . He never cared about making money over doing the right thing." (Ex. S)

Simon Corney was born in London. He resided there with his American wife and three children, two of whom were born in the U.S. Ten years ago, after

his marriage ended in divorce, Mr. Corney agreed with his ex-wife to return to New York for the benefit of their children. Mr. Corney moved to Woodmere, New York and joined the synagogue where the Elefants belonged. "Within seconds of walking through the doors" Marc greeted him; introduced him to his friends; introduced his children to other children; seated him next to Marc so he felt comfortable; and insisted that after the service he and his children come to the Elefant's home for lunch. The Corney and Elefant families are now best of friends.  He writes:

> Both Izzy and  his wife Karen literally changed our world. I sometimes dread to think what would have happened had  we walked into that synagogue without this guy befriending us, what would have happened to my children if they had  turned  up at school without recognizing the friendly faces they had  played  with a few days earlier. J asked myself if I would have been that guy, that Izzy who showed  us such warmth and hospitality. I definitely wasn't but hope I am now. (Ex. MM)

Michael Muller is an asset manager who has known Marc for twenty years.  Mr. Muller describes Marc as a "kind, gentle soul, an attentive parent, and a man committed to his community.  Mr. Muller recalls that during Marc's "tenure as community leader I witnessed acts of charity. From sensitivity to people who could not afford synagogue membership to the delivery of packages to vulnerable community members before holidays, and from organizing of youth programming in or community."  (Ex. NN)

Jennifer Gardyn is the Vice President of Gordon Sinclair, a family business with over 100 employees.  She and her husband have known the Elefants for over five years and are good friends.  She describes Marc's

involvement in the community thusly:

> Marc is someone that we always looked up to. He was the leader of our synagogue and took countless hours of his time to dedicate to the community efforts. He has hosted many fundraising events. When there was someone who needed help, Marc was the one to call. He is always there for others in need without question. He is an upstanding member of our community and is known for his charitable donations of both time and money. He is a modest, humble person who only has the best intentions in mind. He is a good friend and role model for all of us and his family. Marc is truly one of the most selfless people my husband and I are privileged to know. (Ex. OO)

Without exception, those who know Marc well describe him as kind, compassionate, caring, sensitive, genuine, honest, ethical, and dedicated to the community. Marc's kindness is focused on the community generally and on individuals in need specifically. The following community people have written letters of support on Marc's behalf:

- Karen and Daniel Appel write that "Marc was always an upbeat, friendly and caring friend." (Ex. PP)
- Samuel Baratz calls Marc a "loving father, caring friend, and pivotal member of the community." (Ex. QQ)
- Dr. Michael Berry describes Marc as a "true giver," "always one of the first people to volunteer for a charity . . ." (Ex. RR)
- Jeremy Crane has known Marc over three decades. He states that Marc Elefant has a "demonstrated commitment to his . . community . . . and that his contributions to the community have been recognized by his peers and he is highly respected as a member of our synagogue." (Ex. SS)
- Murry Englard knows Marc as a "man of sympathy; he is a man of community . . . a selfless individual who has devoted his time for the betterment of others . . . There are no personal motives or gain. It is a pure feeling of concern for the needy and the underprivileged that drives Izzy in order to lift their spirits and give them a feeling of belonging and not abandoned by society." (Ex. TT)
- Joshua P. Feiler, Esq., is Principal and Tax counsel at a $50

billion hedge fund in Manhattan. He describes Marc as a "pleasant, kind and giving personality." (Ex. UU)

- Amy and Daniel Feldman have known Marc over 20 years and remain close friends. They write that Marc is "a force for good in our local community." That he is "a good neighbor, a good father, and a pillar of the community." (Ex. VV)

- Jonathan Glatt has known Marc for almost 40 years. He describes Marc as a "leader, a man of integrity, a man not to shy away from helping others." He recalls 35 years earlier when they were studying in Israel, Jonathan was in a terrible accident in the mountains. Marc "literally crawled on his stomach into a mountain to save me," leading Israel Defense soldiers "through treacherous terrain to effect a near impossible rescue." (Ex. WW)

- Riva and Eli Goldschmiedt describe Marc as "a man of the highest moral character; he is a man who values relationships not only with family and close friends but will all he meets." (Ex. XX)

- Leib Gershkovich is a pharmacist and has known Marc for 43 years. He notes Marc's" relentless and tireless concern over security during these years made me and all our congregants feel safe. He is well-liked by all in the community . .. His generosity and kindness by giving of his time . . .' (Ex. YY)

- Jaime Gitler notes Marc's "involvement in communal affairs and dedication to our synagogue are a reflection of his true character." (Ex. ZZ)

- David Goldberg notes Marc's devotion to the community. (Ex. AAA)

- Benjamin Goldstein, Esq., observes that "Marc led the synagogue with dedication and humility . . . all under the radar and without fanfare." He notes, as do so many others, Marc's fight for security during the continued explosion of antisemitism. (Ex. BBB)

- Avi Golembeck served with Marc on the Board of Trustees at the IPM. He calls Marc "a kind and compassionate person leading by example . . ." (Ex. CCC)

- Allen and Selma Gottfried state that Marc's "personality expressed honesty, forthrightness, dedication, devotion and caring . . ." (Ex. DDD)

- Andrew Gottfried is 22 years old. He writes that Marc is a "warm, caring family man who treats friends like family." (Ex. EEE)

- Michael Gottfried is presently in the real estate business with Marc and calls Marc a "man of extreme morality,

integrity and honesty. . . He  cares for our tenants, ensuring they have all the necessary accommodations and amenities. Our company couldn't run without Izzy leading the charge." (Ex. FFF)

- Benjamin Gross is an administrator and PhD. candidate at a private school with 1400 students.  He describes Marc as "an upstanding individual in our community . . .While others do it for fanfare, Izzy is quiet about the help he gives others.  I have had many families tell me privately of the countless effort Izzy has put into helping families  who need financial support, legal support,   and sometimes really important moments of friendship during hard times." (Ex. GGG)

- Eric Hackel is a Managing director at Deutsche Bank, in charge of running the Global Equities Division.  He attests to Marc's community "leadership" and "charitable acts." (Ex. HHH)

- Isaac Kalish credits Marc for "starting and running the security committee" keeping the members safe. (Ex. III)

- David Kerstein, Esq., is a Managing Director at Barclays and a graduate of Harvard Law School.  Mr. Kerstein worked closely with Marc at the IPM and credits him with doing anything needed to help the community, "giving generously" of his time.  (Ex. JJJ)

- Robert Konig, Esq. notes Marc's amazing involvement in the community, treating everyone with "respect and compassion."  (Ex. KKK)

- Robert Lawrence calls Marc "a community man and good person who does things for people without bragging and demanding honor or recognition."   (Ex. LLL)

- Aryeh  Lemberger notes all of the work Marc has gone for the IPM and calls Marc a "reliable, trustworthy and important part of the community . . , but is never one to  seek the spotlight or look to accolades." (Ex. MMM)

- David Levine describes Marc as a "selfless man who is always available and generous with his time" on behalf of the community.  (Ex. NNN)

- Rachel Levine writes that "Izzy is involved in a variety of communal causes and is a man who gives freely of his time and energy.  . . People gravitate to him because he is man of high moral standards, compassion and honesty." (Ex. OOO)

- Gary Mandel, Esq., often asked and received legal advice from Marc in the personal injury arena.  He attests that Marc was "kind and courteous to his clients and to everyone in the building."  (Ex. PPP)

- Jonathan Marks writes that Marc is an "essential part of the broader community.  He is a positive influence and a valued

member of . . . his community." (Ex. QQQ)

- David Mossberg is the co-founder of a Behavior Health company.   He describes Marc's "commitment and dedication and unwavering commitment to the safety of his community and family." (Ex. RRR)
- Cal Nathan is the CFO of an experimental marketing agency in New York City.  He has known Marc for 35 years.  He describes Marc's commitment to the community as "selfless," devoting "hundreds of hours for many years to community causes and to those in the community in need." (Ex. SSS)
- Brian Orlow, Esq., has been Marc's friend for 35 years.  He refers to Marc as "man of the community."  (Ex. TTT)
- Michael Ostreicher describes Marc as a  "genuine, kind, honest man. . . involved in various charitable causes in or community." (Ex. UUU)
- Adam Penstein, MD, writes that Marc is an "important member of the community" wo shows people "unusual compassion." (Ex. VVV)
- Seth Pilevsky calls MArc a "community fixture" which needs him. (Ex. WWW)
- Robert Rabinowitz has known Marc over 30 years.  He wrote that Marc "has done a tremendous amount for his community.  Specifically, behind the scenes, without asking for any recognition." (Ex. XXX)
- Kevin Rosenberg notes that Marc is a "man of high character" active in the Jewish community.  (Ex. YYY)
- Shawn Rosenthal, Esq., is Vice Chairman for CBRE in the Debt and Structured Finance Group.  Ge has known Marc for 25 years.  He writes that Marc "consistently focuses his time and efforts on the needs of the community and congregation." (Ex. AAAA)
- Jeffrey Rotenberg, Esq., in a partner at DLA Piper in New York.  He calls Marc a "tireless servant" and a "selfless, dedicated community member" who acts without a "scintilla of ulterior motive."  (Ex. BBBB)
- Evan Scharaga notes that Marc is "an active community member and gives of his time to serve the people and does it with all his heart."  (Ex. CCCC)
- David Schreiber calls Marc an "upstanding and important part of our community" whose activism was integral to establishing the necessary security of the congregants resulting from the threats levied at the Jewish community. (Ex. DDDD)
- Jeffrey Schwartz, Esq., also notes the extraordinary work

Marc did to protect the hundreds of members at the IPM. (Ex. EEEE)

- Oscar Seidel describes Marc (and Karen) as "true examples of people that devoted their time and gave back to the community." (Ex. FFFF)
- Brian Sigman notes that Marc "worked tirelessly to help" the synagogue run properly. (Ex. GGGG)
- Bencion Sobel was a "beneficiary of Marc's time and dedication over all these years seeing his honesty throughout . . " (Ex. HHHH)
- Aaron and Teri Stein attest to Marc's "tremendous leadership skills and for caring for each congregant . . who have come to be touched by Izzy's selflessness, and kindness." (Ex. IIII)
- Ilan Tocker writes that "Izzy is amazing. He is connected with so many people. Izzy is on the Shiva committee, Security committee, Kiddush committee, and was IPM President." (Ex. JJJJ)
- Edward Vilinsky, Esq., writes that Marc gibes to the community "with is heart and soul." (Ex. KKKK)
- Suri Rinzler is the Data Strategy and Operations Manager for Bloomberg, LLP. She describes Marc's utter "dedication and compassion" to the community. (Ex. LLLL)
- Jason Rose has known the Elefants for over 30 years. He describes how Marc was always there, often moving other commitments, to help with the free weekly distribution of fresh food to families in need. (Ex. MMMM)
- Michael Rosenberg has known Marc for over 30 years and writes that Marc is "such a genuinely kind and peaceful man . . . and was always a good and honest devoted man." (Ex. NNNN)
- Edward Steinberg is an attorney and partner in the law firm of Leav & Steinberg. He serves as a board member of the New York State Trial Lawyers Association. Mr. Steinberg has worked with Marc over 23 years and describes his character as "always honest, genuine and determined to do things correctly and not taking short cuts. . . .Marc was never one to focus on money . . or to cut corners when it came to working hard and giving his clients ethical and competent representation." (Ex. OOOO)
- Rose Stern is the Financial Controller of LionTree LLC, an investment banking and asset management firm with international offices. She met Marc 10 years ago at IPM and calls him "kind, sincere, honest, and has a tireless devotion to his family, friends and community." (Ex. PPPP)

- Michael Zellner has known Marc over 33 years and recounts that Marc is "beloved by . . . hundreds of people he has touched over the years . . . I believe that whatever Mr. Elefant might have dome to cause him to be sadly involved in this unfortunate episode is an aberration." (Ex. QQQQ)
- Esther Friedman is Marc's cousin. To her, Marc is an "honorable man with integrity and easy going nature . . . Marc is dedicated to his family and makes time to engage in community affairs." (Ex. RRRR)
- Rabbi Jerome Mann has known Marc for over 30 years. He writes that "Izzy cares about his community as he cares for all human beings. He's one of the people that would do anything for anyone in need. . . . Your Honor, Izzy is truly a wonderful man of high moral character." (Ex. SSSS)
- Avrom Raul calls Marc a "man of honor and integrity with strong Jewish values and a devoted family man, He is kind-hearted and good-natured and always the first to lend a hand or to avail himself to anyone in need." (Ex. TTTT)
- Laurie Stone Brofsky is the manager of Volunteer Services for The Marion and Aaron Gural JCC where Marc has volunteered weekly since December 2022 to their request for assistance in the Sustenance Hope Opportunities Place providing nutritional support, basic necessities, guidance and encouragement to people facing hardship. (Ex. UUUU)
- Mark Meyer Appel is the founder and Executive Director pf the Bridge MCP, and served as Trustee of the Mayoral Mental Health Advisory Board and NYC Health & Hospital Services. Mr. Appel met Marc when Marc was promoting a clothing drive for the homeless. Marc agreed to join the Bride MCP to help coordinate the delivery of food and clothing for the homeless in Brooklyn. He requests that Marc be shown "leniency an allow him to continue his community service." (VVVV)

As the dozens and dozens of attached letters demonstrate, Mr. Elefant's conduct in this case—while serious and inexcusable—was aberrant and not representative of his true nature. At heart, Mr. Elefant is a kind, decent, generous and caring person dedicated to his family and to serving his community and thus amply deserving of a second chance. Mr. Elefant's personal history and characteristics merit a substantially below-Guidelines sentence, as recognized by

the Probation Department in its sentencing recommendation. *See Gupta*, 904 F. Supp. 2d at 354 (agreeing with the PSR's statement that "the defendant's commission of the instant offenses was aberrant behavior—not aberrant as defined by the U.S. Sentencing Guidelines, but rather as defined by Merriam–Webster: '. . . atypical,'" and "find[ing] that the aberrant nature of [the defendant]'s conduct by itself would warrant a non-guideline sentence, even aside from the other factors favoring leniency.")

For all of the reasons set forth above, we respectfully urge that Marc Elefant's personal characteristics and history, including his strong family values and long-time charitable history, like the defendants in *Tomko* and *Serafini,* strongly justify a variance to a non-incarceration.

## IV. THE NEED FOR THE SENTENCE IMPOSED

In fashioning an appropriate sentence, one consideration for this Court is whether the imposed sentence is sufficient "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

**i.     The Loss of Mr. Elefant's Law License and Ability to Earn a Living in His Profession, as well as the Numerous other Collateral Consequences He Will Suffer, Should be Considered in Determining a Just Sentence.**

As a result of his felony conviction, Mr. Elefant's license to practice law has been revoked. At the age of 51, Mr. Elefant will have to find another way to support himself and his family. Both courts and scholars have recognized that the loss of one's reputation, career, income, assets, and livelihood are

particularly acute and severe forms of punishment for licensed offenders such as Mr. Elefant and can merit a variance under § 3553(a).  *See, e.g., United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (Defendant properly afforded a downward variance because he lost his teaching certificate and his state pension as a result of his conduct. Consideration of these facts is consistent with § 3553(a)'s directive that the sentence reflects the need for "just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)).   In an insightful opinion, Judge Frederic Block sitting in the Eastern District of New York, citing to *US v. Pauley, supra,* awarded a 33 month variance and imposed a non-jail sentence after trial on a defendant convicted of possession of cocaine with intent to distribute. Judge Block concluded that the collateral consequences faced by a convicted felon formed a basis for a variance *United States v. Nesbeth,* 2016 WL3022073 (May 24, 2016, EDNY).

We urge Your Honor to consider Mr. Elefant's loss of professional license in imposing sentence.

### ii.   Since Mr. Elefant is Extremely Unlikely to Recidivate, A Variance Meets the Goals of Specific Deterrence and the Need to Protect the Community.

Congress has instructed that in fashioning an appropriate sentence the Court should consider under §3553(a) whether a sentence will sufficiently deter the defendant and members of the public at large from committing similar offenses. Section 3553(a)(2)(B) "calls upon the Court to take account of some of the broad general purposes of sentencing, specifically, "the need for the sentence

imposed . . . (B) to afford adequate deterrence to criminal conduct." *Adelson*, 441 F. Supp. 2d at 514 (quoting 18 U.S.C. § 3553(a)(2)(B)). Section 3553(a)(2)(C) requires that a sentencing court consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." *United States v. Pizzino*, 419 F. App'x 579, 583-84 (6th Cir. 2011) (sentence vacated where court failed to address defendant's low risk of recidivism and extensive rehabilitation); *United States v. Pritchard*, 392 F. App'x 433, 437-42 (6th Cir. 2010) (sentence vacated due to court's failure to address defense psychologist's report that defendant had a low risk of recidivism); *United States v. Thomas*, 498 F.3d 336, 339-41 (6th Cir. 2007) (sentence vacated where court failed to consider low rate of recidivism; Court's statement that it read the sentencing report was insufficient). A non-prison sentence would also achieve both of these general and specific deterrence goals.

As an initial matter, the destruction wrought on Mr. Elefant's career, coupled with the horrific damage that his offenses have inflicted on his close-knit family, have provided enormous deterrence to Mr. Elefant and would provide ample deterrence to anyone familiar with the case, particularly any attorney who might consider committing a similar offense. A lengthy term of imprisonment is not necessary to achieve general deterrence. *See United States v. Ilayayev*, 800 F. Supp. 2d 417, 451 (E.D.N.Y. 2011) (finding that with a sentence of five years' probation for possession with intent to distribute oxycodone "[g]eneral deterrence is accomplished. The sentence will send a clear

message that [a conviction[ will result, at the veery least, in a substantial restriction of freedom.")

As far as specific deterrence, Marc Elefant has received the message more loudly and clearly than most. In addition to being criminally prosecuted, his arrest and guilty plea were reported nationally in the news. https://www.reuters.com/legal/litigation/ny-lawyer-pleads-guilty-31-mln-trip-and-fall-fraud-scheme-2022-10-24/; https://nypost.com/2021/08/26/nyc-doctors-and-lawyers-federally-charged-in-fraud-scheme/ Mr. Elefant has suffered intense guilt  and feels deep remorse for his crime, which should weigh heavily in the Court's determination of the just sentence for him. His family and others who rely so heavily upon him are tormented and despondent by the prospect of his absence. Mr. Elefant's unequivocal acknowledgement of his wrongdoing and his very real remorse demonstrates that deterrence through lengthy incarceration is not necessary. Mr. Elefant words ring clear:

> Thank you for giving me the opportunity to write to you. My hands are trembling. Shaking. I am scared, sad, ashamed, and angry at myself. The pain of remorse and regret is excruciating, and makes it hard to think straight, hard to function. I have been carrying this unbearable weight on my shoulders for almost six years. It's so heavy. I want to bare my soul to you - from down deep. Genuine. Real. Brutally honest. I hope and pray to the Almighty, that I can portray a picture of the man  that is vastly different than what you may perceive of the man who pled Guilty in your courtroom on October 24, 2022. This letter is my testimony.
>
> On that Thursday, fifty-one years of my life flashed before my eyes.  Shook me to the core. Just ten days prior to my plea I turned 51 years old.  What should have been a time of celebration, was instead the coronation of my poor judgment, poor choices, sloppy

> and ethically questionable business practices, and my
> complete failure as an officer of the Court and member
> of the Bar. It was my duty to ensure that I represented
> my clients to best of my ability within the bounds of
> Law, that insurance companies not be taken advantage
> of, and the ethical lines were clear. Period. (Ex. B)

Critically, Mr. Elefant would never again subject his wife and children to the emotionally and financially debilitating reality of any type of criminal prosecution.

In her letter to this Court, Ms. Elefant writes about the remorse and change Marc feels for his crime:

> I hope that this letter has been able to show Izzy's
> character. I know him better than anyone else in the
> world. He is absolutely incapable of hurting another
> person intentionally. He has lived his entire life
> honorably and always helping others. Izzy realizes the
> bad choices he has made and will live with the guilt and
> self-recrimination for the rest of his life. He will forever
> live with the pain of watching his family suffer due to
> his actions. He has learned so much from this, and his
> eyes are now wide open. No matter what business Izzy
> finds himself in, in the future, I know he will take the
> lessons from this matter and only do the right thing.
> Izzy will never be the same after this. Over the past
> almost 6 years of suffering he has turned more toward
> God and has become even more empathetic to others
> than before. He has been spending his time
> volunteering at a local food pantry and collecting
> clothes & supplies for homeless shelters. *Id.*

Mr. Elefant's contrition is also evident to his children and to members of the community. Marc's cousin, Malka Abrahams writes that Marc's ethical instincts led him to plead guilty; "It's these character traits that would drive him to take responsibility where he has done wrong." (Ex. WWWW) Dov Elefant writes that Marc has "expressed his remorse for his poor decisions" wishing he

could go back in time to rectify them. (Ex. D)  Marc's son, Max, writes that "I know he is ashamed of his actions.  His remorse is real.  It's written on his face all the time."  (Ex. U) So many other have included in their letters to Your Honor the remorse that Marc has expressed to them for his misconduct.

- Kenneth Frenkel, "the remorse he feels and has expressed about the case;"  (Ex. XXXX)
- Rabbi Mendel Gordon,"I have spoken to and provided spiritual guidance to Izzy . . . and I know the remorse he feels about the case and how hard he tries to make sure to never harm anyone, no matter who they are;" (Ex. YYYY)
- Michael Gottfried: "He feels astonishing remorse for not seeing what was happening sooner and not stopping what was happening." (Ex. HHH);
- Rachel Gottfried, "He feels incredible remorse . . ." (Ex. P );
- Aviva Mann, "His remorse is palpable when we speak. It is heartbreaking." (Ex. F);
- Leyna Mann, "Marc accepting responsibility because it is right despite the consequences." (Ex. I)

Perhaps most emblematic of Marc Elefant's contrition is the effort he has made to reach other professionals to educate them about the importance of being honest in their professional endeavors. Marc has spoken via Zoom to numerous students and professionals describing what he has done and warning them to obey the law. Many of them have written emails describing Marc's genuine and true contrition and the lesson they learned from him. (Ex. AAAAAer 1-11)

Mr. Elefant's nationally reported guilty plea, his public expression of remorse to the community and his private acknowledgment and contrition for his misconduct, particularly to his children and family, is a powerful indicator that he has learned a lesson that he will never forget.  Of course, the fact that Mr.

Elefant will no longer be a practicing attorney will insure that he is never in a position to repeat the same misconduct.  The empirical data also confirms that Mr. Elefant poses a negligible risk of recidivism and is not a danger to the public. Indeed, the United States Sentencing Commission's own research shows that Mr. Elefant's characteristics make him very unlikely to recidivate. According to *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines Release On*e, Exhibit 9 (May 2004), offenders who are in Criminal History Category I and over 50 years old recidivate a mere 6.2% of the time. The subset of true "first offenders"—those who have zero Criminal History Points—as opposed to all offenders in Criminal History Category I—are even less likely to re-offend. *See*, Exhibit six to *Recidivism and the "First Offender"*, *Release Two* (May 2004). Defendants in this category re-offend a mere ***3.5%*** of the time in the 24 months following initiation of probation or release from confinement.  *See also United States v. Wunder*, 2010 WL 654754, at *3, 2010 U.S. Dist. LEXIS 16096 (D. Kan. Feb. 23, 2010) ("This was defendant's first criminal offense. He has no prior arrests. His chance of recidivism is less than some other persons who may also have a criminal history category of I"); *United States v. Oldani*, 2009 WL 1770116, at *5, 2009 U.S. Dist. LEXIS 50538 (S.D. W.Va. June 16, 2009) (observing that "[b]ased on empirical research, the commission found that a defendant with no prior arrests or criminal history has … the lowest rate of recidivism of any group in the study").

According to the Sentencing Commission's statistics, defendants, such as Mr. Elefant, sentenced for fraud crimes with a criminal history of 1 are *least*

*likely to re-offend. See* E. 11 to *Measuring Recidivism.* The Sentencing Commission has also clarified that "[t]here is no apparent relationship between the sentencing guidelines final offense level and recidivism risk . . . the guideline offense level is not designed to predict recidivism, while the criminal history computation is designed to predict [it." *Id. at. P.13.* As a true first time offender with no prior contact with the criminal justice system demonstrates that he, like the defendants in *Oldani* and *Wunder*, is not a danger to society. *See Wunder*, 2010 WL 654754, at *3 (imposing sentence approximately 60% less than the guideline range's minimum; stating "[t]he court does not believe a lengthy jail term is necessary to protect the public from further crimes by the defendant"); *Oldani*, 2009 WL 1770116 at *7 (stating that "[b]ased on his status as a true first offender, there is little likelihood that [the defendant] will be brought before the criminal justice system in the future."). It is therefore compellingly clear that a reduced sentence would not risk public safety.  and that society does need to be protected from him by imposing a prolonged incarceration. Indeed, rather than warehousing Marc in prison, society would be *much better off with* him actively using his skills to better it in the form of community service.[20]

### iii.   A Reduced Sentence of Probation Under the Facts of this Plea will Further the Goals of General Deterrence.

Imposing a reduced sentence of incarceration is <u>consistent</u> with the *general deterrence* purposes mandated under § 3553(a). Indeed, research has

---

[20] A recent meta-analysis of 166 studies concluded that "custodial sentences have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation." Damon M. Petrich et. al., *Custodial Sanctions and Reoffending, A Meta-Analytic Review,* 50 CRIME & JUSTICE 353, 401 (2021).

consistently shown that while the certainty of being caught and the swiftness in imposing punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." M. Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006); *See also United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the *duration* of incarceration provides little or no general deterrence for white collar crimes."). "Three National Academy of Science panels … reached that conclusion, as has every major survey of the evidence." *Id.*; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflt. Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

Moreover, even a probationary sentence sends a strong message to potential white-collar offenders.  *See United States v. Tomko*, 562 F.3d 558, 573 (3d Cir. 2009) (declining to adopt government's argument that district court's probation-only sentence in complex securities fraud case, which the government described as a "100% variance", would harm general deterrence; *See also Gabbay, supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.")[21] "[E]mpirical research shows no

---

[21] *See generally* Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence?* 100 J. Crim. L. & Criminology, 765, 817 (2010) (summarizing empirical studies of deterrence and concluding there is no apparent deterrent effect from more severe punishments, a modest deterrent effect for the perceived certainty of legal punishment, and "an even stronger effect for the certainty of non-legal or informal sanctions"); Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less is More When it*

relationship between sentence length and deterrence."[22] With respect to the question of whether there is any "particular quantum of punishment that results in increased deterrence and thus decreased crime":

> … Here the findings are uniformly negative: there is no evidence that increases in sentence length reduce crime through deterrence. Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects …[23]

Furthermore, "general deterrence" alone cannot support the weight of a sentence sending an individual to a lengthier prison sentence. *See United States v. Corsey*, 723 F.3d 366, 381 (2d Cir. 2013) (Underhill, J., concurring) (where the district court's § 3553 analysis relied "almost exclusively on one word – deterrence," that factor simply could not "bear the weight assigned it in the totality circumstances of in the case," (quoting *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008)). Several courts have recognized the over-emphasis on "general deterrence" as a basis for imposing prison sentences. For example, in *United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010), the defendant, who was convicted of bankruptcy fraud and bank fraud, was sentenced to a five-year period of probation with house arrest in lieu of the recommended Guideline sentence of 27-33 months. During sentencing, the District Court first noted that

---

*Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1203 (2014) ("[S]tudies repeatedly show that awareness of potentially severe sanctions does not produce less crime."); Robert Weisberg, *Reality-Challenged Philosophies of Punishment*, 95 Marq. L. Rev. 1203, 1248 (2012) (summarizing empirical research on general deterrence which concludes that "although the general deterrent effect may operate at some base rate to reduce crime, changes in penal policy or enforcement play little role in sending a message that crime does not pay").

[22] Amy Baron-Evans, *Sentencing by the Statute*, at 7 (Apr. 27, 2009).

[23] *Id.* quoting Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: *A Review of Research*, at 28-29 (2006) (emphasis in original).

the defendant was unlikely to re-offend because of his post-offense rehabilitation. Then, the Court explained that "general deterrence" was not a significant factor in the case. *Id*. at 1011. The District Court reasoned that the conditions of probation and restitution constituted sufficient "specific deterrence" to prevent Edwards from engaging in similar conduct in the future. *Id.* In upholding the District Court's sentence, the Ninth Circuit held that § 3553(a) "does not require the goal of general deterrence be met through a period of incarceration." *Id*. at 1016; *See also United States v. H. Ty Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015) (finding the message sent by probationary sentence in tax evasion case with advisory Guidelines of 46-57 months sufficient to satisfy general deterrence under § 3553(a)).

## V.    THE KINDS OF SENTENCES AVAILABLE

The Court has broad discretion in imposing sentence on Mr. Elefant. There is no mandatory minimum, and a statutory maximum of 5 years. The advisory Guidelines are months 37-46  months.[24] Statutorily, probation may be imposed for a term of not less than 1 nor more than 5 years and  a term of supervised release of not more than 3 years. There is a mandatory special assessment of $100. The Guidelines advise a fine between $20,000 and $200,000, with a maximum of $250,000.    Mandatory restitution is $1,486,000.00.

Significantly, courts have recognized that imprisonment is often not required to punish a defendant. As explained by the Supreme Court in *Gall,*

---

[24] Should the Court agree with the prosecution that the vulnerable victim adjust is warranted, the offense level increases by two to 23.

*supra.,* a noncustodial sentence can still involve a "substantial restriction of freedom". In that case, the Supreme Court upheld a sentence of 36 months' probation for a defendant where the bottom of the Guidelines was 30 months incarceration.

> … We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer. …

*Id.* at 48-50 (citations omitted). *See also United States v. Springer*, 684 F. App'x 37, 40 (2d Cir. 2017) (referring to Supervised Release as "conditional liberty"). Courts have recognized that society can in fact benefit from sentencing individuals to non- custodial sentences that would allow them to use their skills to better serve the community. *United States v. Coughlin*, No. 06-CR-20005, 2008 WL 313099, at *7 (W.D. Ark. Feb. 1, 2008) (sentencing a Walmart executive who pled guilty to aiding and abetting wire fraud and filing false tax returns, yielding a guideline range of 27 to 33 months of imprisonment, to five years' probation, including 27 months of home detention and 1,500 hours of community service in part because defendant's "expertise is better put to use than wasted in the physical deterioration of unnecessary imprisonment"); *United States v. Warner*, 792 F.3d 847, 854 (7th Cir. 2015) (despite a Guidelines range

of 46 to 57 months, the court affirmed a sentence of a defendant to two years'
probation; district court found that due to defendant's extensive philanthropy,
"'society will be best served by allowing [defendant] to continue his good works'
outside of prison"); *United States v. Smith*, No. 1:06-CR-00394, 2009 WL
249714, at *4 (N.D. Ohio Feb. 2, 2009) (finding community service would put
defendant's abilities as an accountant and lawyer to "good use," and commented
that those "abilities [] would otherwise be wasted during a more lengthy prison
term"); *United States v. Collado*, No. 07-CR-1144, 2008 WL 2329275, at *5
(S.D.N.Y. June 5, 2008) (noting "community would be better served by having
[defendant] in it and available to provide substance abuse treatment to others").
Certainly then, if non-custodial sentences meet the goals of sentencing,
sentencing Mr. Elefant to a term of probation incarceration meets the goal of
both deterrence and punishment within the ambit of the parsimony clause.

Moreover, the First Step Act of 2018, P.L. No. 115-391 ("the Act")
reflects a bipartisan Congressional effort to impose substantial changes to the
tough-on-crime prison and sentencing laws of the 1980's and 1990's that led to
an explosion in federal prison populations and costs. *See United States v. Simons,*
375 F.Supp.3d 379 (E.D.N.Y. 2019). Among other things, the Court in that case
cited a House Judiciary Committee report relied upon by Congress in voting
overwhelmingly to pass the Act which found:

> … [the Bureau of Prisons] has a growing prison population that,
> because of its rising costs, is becoming a real and immediate threat
> to public safety. … If the current spending trajectory continues and
> we do not reduce the prison population and prison spending, there
> will continue to be fewer and fewer prosecutors to bring charges,
> fewer agents to investigate federal crimes, less support to state and

> local criminal justice partners, less programs, and cuts along a
> range of other criminal justice priorities . . .

H.R. Rep. No. 115-699, at 23-24 (2018) (internal citations omitted). Another

source cited in *Simons, supra*. is Ames Grawert *et al*., *Ending Mass*

*Incarceration: A Presidential Agenda*, Brennan Center for Justice 1, 2 (2019);

H.R. Rep. No 115-699, at 22 (2018) (explaining that Congress saw a need to

reform the federal prison system "through the implementation of corrections

policy reforms designed to enhance public safety by improving the effectiveness

and efficiency of the federal prison system in order to control corrections

spending, manage the prison population, and reduce recidivism.")

　　The Court may also consider the expected cost of a particular sentence.

According to the Administrative Office of the United States Courts, the annual

cost of a Bureau of Prisons facility is $37,448, while supervision by a Probation

Officer is $4,472. PSR at ¶ 99. It is therefore more than **eight times** more

expensive to incarcerate someone than supervise them on probation. *See, e.g.,*

*United States v. Graham*, 915 F.3d 456, 460 (7th Cir. 2019) (court's consideration

of incarceration costs, although not explicitly mentioned in 18 U.S.C. § 3553(a),

appropriately played into its analysis of the cost benefit to society, and the benefit

to the inmate when determining sentence); *United States v. Scholar*, 252

F.Supp.3d 711 (WI E.D. 2017) (finding a lengthy period of home confinement

would be as efficient, and less costly, than imprisonment as a form of punishment

for defendant with serious health conditions).

## VII.　MARC ELEFANT'S EMOTIONAL AND PHYSICAL CONDITION SUPPORT A PROBATIONARY SENTENCE.

A sentencing court must consider "the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment *in the most effective manner*", 18 U.S.C. § 3553(a)(2)(D), as well as "any pertinent policy statement". 18 U.S.C. § 3553(a)(5). (emphasis added).[25]

Marc's emotional health has also been seriously impacted by his conduct. As stated in Mr. Elefant's PSR, he suffers from significant serious physical health issues, including Type II Diabetes, high cholesterol, and obesity. Marc also experiences bouts of severe pain from a shoulder labrum tear he sustained when he fell off of a ladder in 2004. He still has continued pain despite four arthroscopic surgeries at NYU Langone, the latest in 2017. In 2010, Marc sustained a severe injury to his lower back in an automobile accident which caused small fractures to his iliac and numbness to his leg and foot. In 2011 and 2012, Marc underwent two corrective surgical procedures to fuse the L5-S1 vertebrae in his spine. Marc has learned to accept as best he can the chronic pain from these conditions which impacts on his ability to walk. (PSR ¶¶ 76-79)

Emotionally, Marc has been diagnosed with Generalized Anxiety Disorder, characterized by persistent, excessive, and unrealistic worry about

---

[25] Although we move for a variance pursuant to 3553(a) factors only, it is noteworthy that even pre-*Booker,* age, mental and emotional conditions, physical condition, and family ties and responsibilities were all the subject of policy statements upon which a departure could be granted. (*see* U.S.S.G. § 5H1.3 "Mental and emotional conditions may be relevant in determining whether a departure is warranted … In certain cases, a downward departure may be appropriate to accomplish a specific treatment purpose."); U.S.S.G. §5H1.4 "Physical condition … may be relevant in determining whether a departure is warranted. An extraordinary physical impairment may be a reason to depart downward*; e.g*., **in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.** (Emphasis added).

everyday things. Marc received therapy and is on medication for his condition. (PSR §§ 80-81). As corroborated in his PSR, from 2017 till the present, Marc has been receiving therapy and treatment at several locations for his severe anxiety and general depression, including the New Horizon Counselling Center, a non-profit organization licensed by the New York State Office of Mental Health.   Juliette Giorgio, LMSW, has written a letter detailing Mr. Elefant's mental condition for this Court. (Ex. ZZZZ)

Notably, the PSR concluded that Marc's issues were sufficiently serious that they formed a basis for the variance recommendation. (PSR p. 31). Clearly, a defendant's health is factor which can weigh strongly in favor of non-custodial sentence.

In *United States v. Scholar*, 252 F.Supp.3d 711, 714 (WI E.D. 2017), the defendant, who had prior drug convictions, was involved in drug trafficking as part of a racketeering enterprise. Despite advisory Guidelines of 87-108 months, the court imposed a sentence of time served, three years supervised release and one-year home confinement based in part upon the seriousness of defendant's health conditions.

In *United States v. Edwards,* 595 F.3d 1004, 1011 (9th Cir. 2010), the Court granted a downward variance so that the defendant could continue to receive uninterrupted medical treatment outside of prison.   On appeal, the Ninth Circuit affirmed the probationary sentence for bankruptcy fraud and making false statements—notwithstanding the 27-33-month Guidelines—for a 63-year-

old defendant *with a prior criminal record.*  The court reasoned that while the BOP was capable of providing Edwards' medical care, a sentence of probation would satisfy the requirement of providing needed care in the most effective manner. 18 U.S.C. § 3553(a)(2)(D).

In *United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008), the Eighth Circuit affirmed a probationary sentence for a defendant who pleaded guilty to conspiracy to distribute 102 grams of cocaine based in part upon serious health issues.

In *United States v. Baron,* 914 F. Supp. 660 (D. Mass. 1995) pre-*Booker*, the defendant convicted of bank fraud with Guidelines of 27-33 months, and was sentenced to one year probation, with 6 months to be served on home detention, since incarceration would risk rapid deterioration of defendant's interrelated medical conditions.

In *United States v. Willis*, 322 F.Supp.2d 76 (D. Mass 2004) pre-*Booker*, defendant plead guilty to failing to report income derived from his illegal gambling business and failing to file tax returns, the court departed from level 17 to level 10, in order to impose a sentence of probation, where it found that the 69 year old defendant suffered from numerous medical conditions.

For all of the aforementioned reasons, Marc's numerous and significant health concerns weigh in favor of a variance and against the imposition of a term of imprisonment.

### i.      The Bureau of Prisons Cannot Provide Mr. Elefant's Medical and Mental Health Care In the "Most Effective Manner".

Although the Bureau of Prisons often claims they are able to provide

medical care for any condition, the Department of Justice's own internal audits detail the abysmal medical care most federal inmates actually receive. For example, a report by the Department of Justice's Office of the Inspector General found that the Bureau of Prisons often does not provide required medical services to inmates. *See*, *The Federal Bureau of Prisons' Efforts to Manage Health Care* (2008) at 32-34. As one example, this report cites an inmate who was referred to the chronic care clinic upon intake but was not seen until five months later. When he was seen, an EKG performed at that time showed abnormal results which were not reviewed by a doctor until two days later -- the day the inmate died of a heart attack. *Id*. at 33. The same report further found that preventive services are often not provided, chronic conditions and medication side effects are often not monitored, and unqualified persons are providing services. *Id*. at ii-xx, 32-34, 51-52. At several institutions, the BOP has allowed medical practitioners to perform medical services without valid authorizations, privileges, or protocols. *Id*. at 48-49. There is also anecdotal evidence of serious lapses in care. *See*, *i.e., Lopez v. United S*tates, 2005 WL 2076593 (E.D.N.Y. 2005) (former inmate awarded $1 million for late stage throat cancer where repeated requests to see a specialist were ignored for nearly two years, requiring removal of his voice box).

A second Department of Justice Report, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004) concluded that offenders' health problems before and during incarceration accelerate their aging processes to an average of 11.5 years older

than their chronological ages after age 50. *Id.* at 10. *See also*, Natalie Hinton, Comment, *Curing the BOP Plague with Booker: Addressing Inadequate Medical Treatment in the Bureau of Prisons,* 41 J. Marshall L. Rev. 219, 247 & n. 133 (2007) ("BOP's consistent claim that it can address all medical needs of inmates has not proven true"; and "because of rampant overcrowding, underfunding and understaffing, the "quality" and availability of BOP health care have "plummeted,"" *id.* at 232–33 n. 60); Eldridge, Elizabeth, *Why Prisoners Get the Doctors No One Else Wants,* The Appeal, Nov. 8, 2019, (finding that "correctional healthcare is fraught with conditions that allow problematic doctors to flourish").

Prisoners in need of mental health care, like Marc, do not appear to fare any better than those needing medical care. *See, Treatment Denied: The Mental Health Crisis in Federal Prisons,* The Marshall Project, December 21, 2018 (finding that the Bureau of Prisons is helping fewer inmates with psychiatric services, despite setting higher standards for psychiatric care). Even assuming that the medical and emotional care Marc will receive from the B.O.P. is minimally adequate, there is no question that the time in jail for one with chronic and debilitating medical conditions is far more difficult than for healthy inmates. An infirm defendant's shorter life expectancy supports leniency based on the sentencing goals of proportionality and avoiding unwarranted sentencing disparities. *See*, *e.g., United States v. Marsh*, 820 F. Supp. 2d 320 (S.D.N.Y. 2011) (year-and-a-day sentence for a 52-year-old defendant with heart disease and related conditions despite Guideline range of 108-135 months because,

among other things, "defendant's many health problems will … make it harder for him to serve a prison term").

It is therefore apparent that because the Bureau of Prisons cannot provide Marc's medical care in the most effective manner, as required by § 3553(a)(2)(D), that a variance is warranted.

## VIII. THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT.

During the period 2013-2017, nationally the rate of within-range sentences for fraud offenses has decreased from 49.4% in fiscal year 2013 to 44.4% in fiscal year 2017. *See*, United States Sentencing Commission *Quick Facts: Theft, Property Destruction and Fraud Offenses* at \*2.  For the year 2021 alone, 73.4% of all fraud defendants nationwide received sentences of up to 24 months, and just 18.6% received sentences of 24 to 59 months. See www.ussc.gov/guidelines/judiciary-sentencing-information.     Even    more granularly, for the fiscal year 2021, in the 2nd Circuit alone, 78.7% of Section 2B1.1 fraud defendants with a criminal history category of 1received less than a 24 month sentence with a median sentence length of 6 months and an average of 15 months.  *Id.*  The 3553(a) factors discussed in this memorandum strongly support a sentence below the 6 month median range to a term of probation.

This trend includes sentences elsewhere for substantially more egregious crimes than at bar.  See for example,  *United States v. Stephen Jemal,* 15 Cr. 570 (JRP) (EDPA June 20, 2019)($8 million bank fraud.  Court granted variance from 78 months to 18 months incarceration); *United States v. Jason*

*Nissen,* 17-cr-477 (PAE) (SDNY) (Sept. 2019) (defendant convicted of $71 million Ponzi scheme. Variance from 97 months to 27 months granted based in part on defendant's charitable endeavors and family circumstances); *United States v. Lumiere*, 16-cr-483 (S.D.N.Y.) (former portfolio manager at Visium Asset Management convicted after trial of securities and wire fraud involving between $9.5 and $25 million loss to investors and millions of dollars in unlawful gain to defendant. Despite defendant's "highly significant" role in the scheme and his attempt at blackmail to conceal his crimes, variance granted from 87-108 to 18 months' imprisonment); *United States v. Block*, No. 16-cr-595 (S.D.N.Y. 2017) (former CFO of a publicly traded real estate investment trust masterminded fraud to manipulate the company's financial results resulting in $300 million shareholder loss. Defendant also "brazenly" falsified key accounting numbers. Noting, among other things, the defendant's clean criminal record prior to the offense and his "personal history" as a good father and friend, court imposed variance from 84 years to 18 months. See *Brian Block sentenced to 18 Months In Prison*, Investment News (Nov. 8, 2017), http://www.investmentnews.com/article/20171108/FREE/171109929/brian-block-sentenced-to-18-months-in-prison); *United States v. Corvine*, No. 15-cr-00171 (S.D.N.Y.) (conviction after a three-week trial for role in a complex scheme to profit from the manipulation of the price of securities while clients lost entire investment. Cervino also lied to the SEC during the course of its investigation. Dkt. 362 at 3-7. Court sentenced defendant to one year and a day with a variance from 135-168 months, Judgment, No. 15-cr-00171, Dkt. 367 at

3.); *United States v. Litvak*, No. 13-cr-19 (D. Conn. 2018), after trial Guidelines sentence of 108 months' imprisonment rejected and sentence of two years imposed for sophisticated fraudulent conduct affecting numerous victims, and causing millions of dollars in loss, in over 55 securities transactions over the course of three years. Sentencing Tr., July 25, 2014, Dkt. 273 at 61:13-17, 158:15-19); *United States v. Graham*, No. 06-cr-137 (D. Conn.), the defendant, an in-house attorney, convicted of conspiracy and fraud charges in a fraudulent reinsurance transaction. Court found fraud caused a loss of over $500 million and defendant affirmatively concealed the fraudulent nature of the transaction. Order of Oct 31, 2008, No. 06-cr-137, Dkt. 1164 at 15. Variance from sentence of life imprisonment and imposed a sentence of one year and one day, along with two years of supervised release. Judgment, No. 06-cr-137, Dkt. 1269 at 1); *United States v. Caspersen*, 16-cr-414 (JSR)(SDNY), defendant defrauded friends and college classmates out of $36,000,000 in Ponzi scheme, using their money to make payments on a house and an apartment. Court imposed a variance from the defendant's Guideline range of 151-188 to 48 months in prison.); *United States v. Newkirk*, 16-cr-1241 (JSR) (S.D.N.Y. Apr. 21, 2016), a securities fraud defendant convicted at trial was sentenced to a term of imprisonment of 6 months notwithstanding a Guidelines range of 135 to 168 months.) Three  other defendants sentenced recently in the SDNY with Guidelines ranges of 70-97 months, were sentenced, respectively, to terms of imprisonment of 24 months (*United States v. Hochfeld*, 13-cr-00021 (PAC)(S.D.N.Y. 2013); 24 months (*United States v. Gray*, 15-cr-00297 (SHS)

(S.D.N.Y. Oct. 25, 2016); and 30 months (*United States v. Hampton*, 13-cr-301 (RWS) (S.D.N.Y. 2013);

Accordingly, when considering all of the § 3353(a) factors, counsel respectfully suggests that a noncustodial sentence would not constitute an unwarranted sentencing disparity and would be consistent with sentences imposed upon defendants who are similarly situated.

### VIII.  NO FINE IS WARRANTED.

Consistent with the recommendation contained in the PSR, we urge that given Mr. Elefant's financial condition and his restitution obligation, that no fine be imposed.

### CONCLUSION

**CONSIDERATION OF THE SECTION 3553(a) FACTORS FAVORS A SENTENCE OF PROBATION AND COMMUNITY SERVICE AS FAIR AND JUST UNDER THE PARSIMONY CLAUSE.**

We submit that consideration of the facts in light of the Section 3553(a) factors militate in favor of a probationary sentence combined with a period of community service.  Under  "the nature and circumstances of the offense and the history and characteristics of the defendant," the Court should consider that Mr. Elefant, age 51, has no prior criminal convictions; has shown utter remorse for his crime which occurred almost 6  years ago; has been a decades-long benevolent and charitable community member and continues as such until this very day; and is a loving and indispensable part of his family, with an ill wife and children dealing with very serious psychological issues.

A non-prison sentence properly accounts under the parsimony clause for what Marc did, who he is, the damage he caused to his family, and how he continued to act constructively in the community even after his wrongdoing was brought to light.  Simply put, society is much better off having Marc Elefant serve the community rather than imprisoning him.

Dated:   New York, NY
         March 31, 2023

                    Respectfully submitted,
                    **BACHNER &  ASSOCIATES, P.C.**


                    By: _/s/ Michael F. Bachner_____
                         Michael F. Bachner MB-7719

                    111 Broadway, Suite 701
                    New York, NY 10006
                    T: (212) 344-7778
                    F: (212) 344-7774
                    mb@bhlawfirm.com

                    *Attorneys for Defendant  Marc Elefant*