UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                  :

UNITED STATES OF AMERICA

                                    :

         - v. -

                                    :    S4 21 Cr. 530 (SHS)

MARC ELEFANT,

                                    :

                     Defendant.

                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM OF THE
## <u>UNITED STATES OF AMERICA</u>

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Nicholas Chiuchiolo
Nicholas Folly
Danielle Kudla
Alexandra Rothman
Assistant United States Attorneys
     *- Of Counsel -*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND ..................................................................................................... 2

ARGUMENT .......................................................................................................... 6

I.  The Guidelines Are Properly Calculated As 46 to 57 Months' Imprisonment ........................ 6

II. The Court Should Sentence the Defendant Within the Guidelines of 46 to 57 Months'
    Imprisonment .................................................................................................. 11

    A.    Applicable Law ........................................................................................ 11

    B.    A Sentence of 46 to 57 Months' Is Necessary In Light of the Section 3553(a) Factors 12

        1. The Need For The Sentence To Reflect The Nature and Seriousness Of the Offense .. 12

        2. The Need To Afford Adequate Deterrence To Criminal Conduct ................................ 13

        3. The Need to Impose a Just Punishment and Promote Respect for the Law .................. 14

        4. The History and Characteristics of the Defendant Do Not Justify a Term of Probation 16

        5. The Defendant's Remaining Arguments Are Unpersuasive ......................................... 18

    CONCLUSION ................................................................................................... 20

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of defendant Marc Elefant and in response to the arguments raised by the defendant in his sentencing memorandum dated March 29, 2023.

The defendant – an officer of the court – knowingly participated in an egregious fraud scheme, in which poor, homeless and vulnerable clients were recruited to stage trip-and-fall accidents, file fraudulent lawsuits, and undergo medically unnecessary surgeries.  Between 2015 and 2017, Elefant was an integral part of this scheme.  Without him, hundreds of lawsuits could not be filed, cases could not be funded, surgeries could not happen, and, most importantly, scheme participants could not get paid.  In this scheme, the lawyers were critically important and yet, by the very nature of their positions, they managed to stay insulated, often avoiding the dirty work throughout the scheme.  Lawyers did not travel to housing projects or homeless shelters to find patients.  They were not at the staged accident sites.  As a result, when law enforcement came knocking, as it did in 2017, lawyers like Elefant could feign ignorance and claim they had been duped.

This was the defendant's position – absolute denial – for years until he was indicted in August 2021, and then pled guilty in October 2022, just a month shy of trial.  But even now, just weeks from his sentencing date, and despite claims that he has engaged in deep reflection to understand the reasons he got involved in this scheme, the defendant attempts to minimize and downplay just how egregious his crimes were.  He maintains that he never knew the accidents were staged, as if that somehow makes his conduct any more palatable.  It does not.  And it is also not credible.  He insists this is a case about conscious avoidance and a busy caseload that prevented him from carefully scrutinizing his cases.  It is not; Elefant *knew* this was a criminal scheme, and

chose to remain involved.  And he begs this Court for a punishment without prison time, citing to his family needs, his community support, and the suggestion that he has been punished enough. He has not.

The defendant's crimes in this case demand a prison sentence, and the Guidelines, as calculated by the Government and the Probation Office, of 46 to 57 months' imprisonment, are sufficient, but not greater than necessary, to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

When a lawyer like Elefant engages in a fraud that preys upon desperate individuals and involves unnecessary surgeries, the Section 3553(a) factors, and specifically, the nature and circumstances of the offense, the need to afford adequate deterrence to criminal conduct, and the need for the sentence to promote respect for the law and to provide just punishment for the offense, cry out for a prison sentence.  Put differently, the defendant's community support, charitable deeds, and personal circumstances do not move the needle to where anything short of a Guidelines sentence is appropriate.  For these reasons, and as set forth below, the Government respectfully requests that the Court sentence the defendant to 46 to 57 months' imprisonment.

## **BACKGROUND**

### A.  Relevant Facts

Having presided over two trials and having sentenced four[1] defendants who also participated in this scheme, the Court is familiar with how this trip-and-fall fraud scheme operated. For this reason, the Government does not summarize the general contours of the scheme here and instead relies on the description of the scheme as set forth in the Government's sentencing letters

---

[1] By the time of Elefant's sentencing, the Court will have sentenced five defendants (Bryan Duncan, Ryan Rainford, Robert Locust, Sady Ribeiro, and Adrian Alexander).

for co-defendants Sady Ribeiro and Adrian Alexander. (*See, e.g.*, Dkt. 222). The Government instead focuses this section on Elefant's involvement in the scheme between 2015 and 2017, if nothing else to correct the misimpression left by the defendant's sentencing submission that the defendant's crime amounts to consciously avoiding the fraudulent nature of 12 cases that he settled in 2017. (*See* Def. Mem. at 14-15). This is a distortion of the facts and the record.

As the Court is aware, in early 2015, Peter Kalkanis, Adrian Alexander and George Constantine had a falling out, and the trip-and-fall fraud scheme split into two groups. Kalkanis needed a new lawyer as Constantine was no longer taking his cases. Kalkanis turned to Michael Kimmel, the owner of Sunset Properties, one of the primary litigation funding companies used throughout the scheme. In April 2015, Kimmel introduced Kalkanis to Elefant. Kalkanis promised the defendant a large volume of personal injury, trip-and-fall cases. Elefant signed up to be Kalkanis's lawyer.

As reflected in GX 1702, an excel spreadsheet offered at the trial of co-defendants George Constantine and Andrew Dowd in December 2022 (the "Second Trial"), between April and December 2015, Elefant took on at least 55 cases that were referred to him by Kalkanis. In 2016, Elefant took on at least 110 cases, nearly double the amount. Those patients included Keona Norwood, Willie Barbour, and Yvette Battle, who testified at the trial of fellow scheme participants Bryan Duncan, Ryan Rainford and Robert Locust in April 2019 (the "First Trial"). Norwood and Barbour also testified at the Second Trial. In the first half of 2017, before Elefant learned of the Government's investigation and dropped many of his cases, Elefant took on at least 25 new cases, including patient Erica Barton, who testified at the Second Trial and patient Clarence Tucker, who testified at the First Trial. Altogether, Elefant represented *hundreds* of clients referred by Kalkanis.

As the records reflect, and as Elefant does not meaningfully dispute, these personal injury

cases were carbon copies of each other. They were all trip-and-fall accidents at outdoor commercial establishments where the client claimed to have tripped over a cellar door, a crack in the sidewalk, or a pothole. The vast majority of clients were brought, two to four at a time, by Reginald Dewitt, a prolific runner who often arrived at Elefant's office under the influence of alcohol. The intake process was always the same. Elefant asked where the accident took place, confirmed the location on Google Maps, and collected basic pedigree information and prior medical history about the client. He rarely met the clients again.

The Government does not allege that Kalkanis told Elefant that the cases would be fraudulent at the beginning of their relationship. But, with the volume of cases that Elefant took on, it became obvious to Elefant – and he knew – that these cases were fraudulent. Fraudulent because the accidents had never happened. Fraudulent because the medical treatments were unnecessary. Fraudulent because the legal filings that Elefant drafted were filled with these lies. But rather than halting his involvement, dropping the cases, giving up his legal fees, and running to the FBI in early 2017, Elefant continued with business as usual. He settled cases and took on new cases for months. It was only during the summer of 2017, after Elefant learned that he was the subject of a federal grand jury investigation, that he dropped many of his cases and stopped taking on new work from Kalkanis.

### B. Procedural History

In April 2018, a little less than a year after Elefant learned of the Government's investigation, an Indictment, 18 Cr. 289 (SHS), was filed against five fraud scheme participants – Kalkanis, Bryan Duncan, Kerry Gordon, Ryan Rainford and Robert Locust. Duncan, Rainford and Locust proceeded to trial and were convicted in May 2019 (i.e., the First Trial). Elefant featured prominently at the First Trial. Patients including Willie Barbour, Keona Norwood and

Yvette Battle described being driven to his office in Brooklyn for quick, pro forma intake meetings, after they had staged their accidents, and then rarely hearing from Elefant again.

In August 2021, an Indictment, 21 Cr. 530 (SHS), was filed against Elefant, as well as co-defendants Constantine, Dowd, Adrian Alexander and Sady Ribeiro.

On October 24, 2022, the defendant appeared before the Court and entered a guilty plea, pursuant to a plea agreement, to a one-count Superseding Information (the "Information"), which charged the defendant with participating in a conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371.[2]

In advance of Elefant's sentencing, the Probation Office prepared a Presentence Investigation Report, which calculates the applicable Guidelines in the same manner as the Government in the plea agreement.   The Government and Probation submit that the offense calculation for the defendant is as follows:

**Base Offense Level:**  Pursuant to U.S.S.G. § 2B1.1(a)(2), the base offense level is six. Pursuant to U.S.S.G. § 2B1.1(b)(1)(H), 14 points are added because the gain was greater than $550,000, but less than $1,500,000.[3]

**10 or More Victims:** Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), two points are added because the offense involved ten or more victims.

---

[2] Co-defendants Ribeiro and Alexander also pled guilty during the fall of 2022.  Constantine and Dowd proceeded to trial, and were convicted at the Second Trial in December 2022.

[3] As the defendant notes, the parties reached a loss amount under Section 2B1.1 in the plea agreement by focusing on 40% of the cases Elefant settled beginning in January 2017.  That number is extremely conservative considering the hundreds of cases that Elefant filed as part of his involvement in the scheme.

**Special Skill:** Pursuant to U.S.S.G. § 3B1.3, a two-level increase is warranted because the defendant used a special skill in a manner that significantly facilitated the commission of the offense.

**Vulnerable Victims:** Pursuant to U.S.S.G. § 3A1.1(b)(1), two points are added because the defendant knew or should have known that a victim of the offense was a vulnerable victim.[4]

**Acceptance of Responsibility**:  Pursuant to U.S.S.G. §§ 3E.1.1(a) and (b), a three-level reduction is warranted because the defendant has clearly demonstrated acceptance of responsibility.

The defendant is assigned to Criminal History Category I.  According to Probation and the Government, the applicable Guidelines range is 46 to 57 months' imprisonment.  The Probation Office recommends a sentence of 18 months' imprisonment – a recommendation with which the Government strongly disagrees.[5]

## ARGUMENT

### I.    The Guidelines Are Properly Calculated As 46 to 57 Months' Imprisonment

As an initial matter, the parties disagree over the application of a two-level vulnerable victim enhancement pursuant to Section 3A1.1(b)(1) of the Guidelines.  The Court previously applied this enhancement in sentencing trial defendants Duncan, Locust and Rainford (and the parties stipulated this enhancement applied in connection with the sentencings of Ribeiro and

---

[4]  The defendant disagrees that this enhancement applies.  The Government addresses the defendant's arguments below.

[5] Simply put, the Probation Office's recommendation of 18 months' imprisonment is bewildering and unsupported by the facts of this case.  The Probation Office bases its recommendation on the defendant's lack of criminal history, the non-violent nature of the offense conduct, and the defendant's family obligations.  As explained in greater detail below, none of those grounds are compelling, let alone justify the extraordinary variance that the Probation Office recommends.

Alexander).  As set forth below, the Government again submits that this enhancement applies in this case, and accordingly, the Court should find that the Guidelines are 46 to 57 months' imprisonment.

### A.  Applicable Law

Under Section 3A1.1 of the Guidelines, a two-level enhancement applies if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). A "vulnerable victim" is a person "who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3," and "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b)(1) & comment. (n.2). "In assessing whether the victim is susceptible to the criminal conduct, the court must consider the totality of the circumstances, including the victim's physical and financial condition and the nature of the crime." *United States v. Borst*, 62 F.3d 43, 46 (2d Cir. 1995) (citing *United States v. Hershkowitz*, 968 F.2d 1503, 1506 (2d Cir. 1992)).

The Second Circuit has identified three "limits on the kinds of conduct that will justify a vulnerable victim enhancement." *United States v. McCall*, 174 F.3d 47, 50 (2d Cir. 1998); *see also United States v. Kerley*, 544 F.3d 172, 180 (2d Cir. 2008). "The first is that the vulnerability of the victim must bear some nexus to the criminal conduct." *McCall*, 174 F.3d at 50. "The second limit . . . is that the defendant generally must have singled out the vulnerable victims from a larger class of potential victims," although the defendant need not have "select[ed] the victim because of his or her vulnerability—it is sufficient that he knew or should have known of this quality when deciding to go ahead with the crime." *Id*. "[A] third limit . . . is that broad generalizations about victims based upon their membership in a class are disfavored where a very substantial portion of

the class is not in fact particularly vulnerable to the crime in question. In such cases, courts have required that the enhancement be based on individualized findings as to the vulnerability of particular victims." *Id*. As to the third limit, however, "class membership alone may be sufficient to support the enhancement" where "the criminal shapes the nature of the crime . . . to target a class of victims that are virtually all particularly vulnerable to that crime." *Id.* at 51.

The "vulnerability inquiry focuses on the victim's ability to protect himself from crime, not the likelihood of harm to the victim if the crime is completed," and "concentrate[s] on whether additional deterrents are necessary to protect such a victim." *United States v. Crispo*, 306 F.3d 71, 83 (2d Cir. 2002); *see also McCall*, 174 F.3d at 51 ("The correct test calls for an examination of the individual victims' ability to avoid the crime rather than their vulnerability relative to other potential victims of the same crime.").

**B. Discussion**

Elefant argues that the vulnerable victim enhancement does not apply for two reasons – one substantive and one seemingly technical. (Def. Mem. 9-16). Elefant first claims the enhancement does not apply because the patients were active participants in the scheme and thus able to "detect or thwart the crime." Elefant next claims that because his "conscious avoidance liability" began in January 2017, and he had filed lawsuits for 12 cherry-picked clients *before* that date, he cannot be on the hook for the enhancement where he did not appreciate the clients were vulnerable at the time he filed their lawsuits. Both arguments should be rejected.

      1. <u>The Vulnerable Victim Enhancement Applies Even Though the Victims Knew About the Fraud</u>

Elefant first argues that the enhancement does not apply because the victims were co-conspirators. In so arguing, the defendant asks this Court to apply an extremely narrow definition

of vulnerable victims, which is unsupported by the law in this Circuit.  Rather, the Second Circuit's decision in *Borst*, which applied the enhancement, is controlling.

In *Borst*, a defendant who sold mobile homes was convicted of bank fraud based on false loan applications he submitted on behalf of customers.  *See Borst*, 62 F.3d at 45. The Second Circuit held that the customers were "vulnerable victims" based on their "financial and medical" conditions "*whether or not* [they] were unwitting instrumentalities of [the defendant]'s criminal conduct in light of their *apparent knowledge* of [the defendant]'s misrepresentations to the bank." *Id.* at 48 (emphasis added). The customers "were exploited and suffered harm as a result of [the defendant]'s actions," the Court explained, so the vulnerable-victim enhancement applied even though "the harm . . . was not an element of any of the crimes of which [the defendant] was convicted." *Id.*[6]  The facts of this case are analogous.

---

[6] The defendant does not dispute that individuals can be vulnerable victims even if not the "technical victim" of the crime.  Nor could he, as this is a well-settled legal principle.  *See United States v. Firment*, 296 F.3d 118, 121 (2d Cir. 2002) (holding that "application of the vulnerable victim adjustment was authorized where the offense conduct victimized a vulnerable person even though the entity directly targeted by the offense of conviction was a different person"); *United States v. Echevarria*, 33 F.3d 175, 180-81 (2d Cir. 1994) (holding that the "enhancement for vulnerable victims [wa]s appropriate where the exploitation of patients [wa]s part of the social security disability scheme, even if the government felt the primary economic impact of the defendant's activities"). Other circuits have taken the same approach. *See, e.g., United States v. Kennedy*, 554 F.3d 415, 424-25 (3rd Cir. 2009) (holding that definition of "victims" for purposes of Section 3A1.1(b) vulnerable-victim enhancement is broader than definition of "victims" under Section § 2B1.1); *United States v. Haggard*, 41 F.3d 1320, 1325-26 (9th Cir. 1994) ("courts properly may look beyond the four corners of the charge to the defendants' underlying conduct in determining whether someone is a 'vulnerable victim' under section 3A1.1"); *United States v. Lee*, 973 F.2d 832, 833-34 (10th Cir. 1992) (explaining that vulnerable victims under Section 3A1.1(b) need not be those who suffered economic loss from embezzlement offense); *United States v. Yount*, 960 F.2d 955, 958 (11th Cir. 1992) (holding that vulnerable-victim enhancement applied even though "ultimately the bank was the victim"); *United States v. Bachynsky*, 949 F.2d 722, 735 (5th Cir. 1991) (affirming application of vulnerable-victim enhancement and stating, "We do not find that the only victims of [the defendant]'s scheme were the deep pockets that paid the phony claims, or that his patients were in no way victims of the fraud").  Here, the Government submits that the insurance companies and property owners, as well as the clients, were the victims of the scheme.

The defendant's attempt to distinguish *Borst* in a footnote is unpersuasive. (Def. Mem. 13 n.6). The defendant claims that *Borst* does not control because the victims in *Borst* were "mostly passive" while the clients in this scheme were "active and willing participants." But the defendant's labels of active and passive are found nowhere in the *Borst* decision. Rather, *Borst* holds that a victim, who is preyed upon based on certain vulnerabilities, qualifies as a vulnerable victim *even if* they understood the scheme was a fraud, and that is precisely what happened here.

In this case, Elefant and his co-conspirators exploited patients and preyed upon their financial vulnerabilities by having them undergo unnecessary surgeries in order to increase the value of fraudulent lawsuits. As this Court found in sentencing co-defendant Robert Locust,

> The whole essence of this conspiracy is [to] find the down and out, find the desperate, find the homeless. No person who had a job and education and can support his or her family even minimally is going to say, Oh, I'll undergo unnecessary back surgery for a thousand dollars. These people were vulnerable and desperate.
>
> ….
>
> Let me change the construct: You're not going to find people who are willing to have their lower backs cut into, or their shoulders or their knees cut into and undergo anesthesia and surgery for an unknown amount of money unless they're desperate and vulnerable.

(1/7/20 Sent. Tr. 12-13). There was ample evidence at the First and Second Trials to support this finding of vulnerability. Patients were picked up from homeless shelters and public housing complexes. As witness Kerry Gordon explained, "homeless shelters were a place where many trip-and-fall recruits came from" because "they were desperate, they needed money, they didn't ask a lot of questions." (Second Trial Tr. 392). Thus, the Court should reject Elefant's first challenge to this enhancement.

2. <u>The Vulnerable Victim Enhancement Applies Even Though Certain Lawsuits Were Filed Before January 2017</u>

In what only can be described as another attempt to minimize his culpability, Elefant argues that the vulnerable victim enhancement does not apply because (a) Elefant's "conscious avoidance" liability began in January 2017, and (b) he filed lawsuits for 12 particular clients before that date. He therefore claims the enhancement does not apply because, at the time he took on those 12 cases, he did not know the clients were victims or vulnerable.

Elefant is correct that, in calculating loss amount, the parties focused on Elefant's gain with respect to 40% of the cases he settled after January 2017. Where Elefant is incorrect, however, is that this calculation limits the application of the vulnerable victim enhancement. As Elefant concedes, and the data establishes (*see* GX 1702), Elefant continued to take on new clients after January 2017 *and* maintained his existing docket of clients as well. Thus, that the lawsuits for 12 specific clients had already been filed by January 2017 is irrelevant where Elefant remained an active participant in a scheme that, by its very nature, preyed upon vulnerable individuals. For this reason, the Court should reject Elefant's second challenge to the vulnerable victim enhancement, and find that the Guidelines are 46 to 57 months' imprisonment.

## II. The Court Should Sentence the Defendant Within the Guidelines of 46 to 57 Months' Imprisonment

### A. Applicable Law

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), *abrogated on other grounds by United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them

into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  After that calculation, however, a sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a).  *See Gall*, 552 U.S. at 50 & n.6. In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a)(2).

### B.  A Sentence of 46 to 57 Months' Is Necessary In Light of the Section 3553(a) Factors

In this case, the Section 3553(a) factors weigh heavily in favor of a sentence of 46 to 57 months' imprisonment.  Elefant dedicates nearly half of his sentencing memorandum to his history and characteristics, (*see* Def. Mem. 24-77), quoting extensively from the hundreds of supporting letters submitted by family and friends, and arguing that his unique circumstances justify a significant downward variance to a non-incarceratory sentence.  They do not.  Rather, a Guidelines sentence is necessary to achieve the purposes of sentencing as set forth in Section 3553(a).

1. The Need For The Sentence To Reflect The Nature and Seriousness Of the Offense

Section 3553(a) provides that the sentence imposed should reflect the nature and seriousness of the offense.  18 U.S.C. § 3553(a)(1), (a)(2)(A).  Here, the defendant's crimes were extraordinarily serious.  The Court understands just how serious the fraud scheme was.  Vulnerable clients were recruited to stage accidents, file fraudulent lawsuits, and undergo medically unnecessary surgeries.  But Elefant's crimes – as an officer of the Court – were particularly egregious and justify a Guidelines sentence.

The New York Rules of Professional Conduct provide that a "lawyer" is an "officer of the

legal system with special responsibilities for the quality of justice."  N.Y. Rules of Prof'l Conduct, *Preamble: A Lawyer's Responsibilities*.[7]  The Rules provide that "each lawyer has a duty to uphold the legal process; to demonstrate respect for the legal system; to seek improvement of the law; and to promote access to the legal system and the administration of justice."  *Id.*  Elefant abandoned these tenets when he got involved in this scheme.  Rather than uphold legal process, he abused it.  Rather than respect the legal system, he tossed it aside.  Rather than improve the law, he used it for his own pecuniary gain.  Rather than administer justice, he preyed upon the most vulnerable members of the community.  Elefant's position as a lawyer makes his crime particularly serious and the Guidelines – which include a two-level enhancement for Elefant's special status as a lawyer –  particularly appropriate.

### 2.   The Need To Afford Adequate Deterrence To Criminal Conduct

Section 3553(a)(2)(B) provides that the Court, in imposing sentence, should consider the need to deter afford adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a)(2)(B).  This factor also weighs heavily in favor of a Guidelines sentence in this case.

The defendant argues that there is no need to deter the defendant from committing further crimes, pointing to the fact that he has no prior criminal history, can no longer work as an attorney, and feels immense remorse and contrition for his conduct.  The Government agrees that the defendant is unlikely to engage in the same offense conduct again, in large part because he has lost his law license.  But concerns about *specific* deterrence are only one factor for the Court to consider.  As the defendant concedes, the Court should also consider the need to achieve general deterrence.

---

[7]https://www.nycourts.gov/ad3/AGC/Forms/Rules/Rules%20of%20Professional%20Conduct%2 022NYCRR%20Part%201200.pdf  (last visited Apr. 6, 2023).

In this regard, and despite Elefant's arguments to the contrary, there is simply no substitute for prison. As Judge Rakoff explained when sentencing a white-collar insider trading defendant to prison, a prison term is necessary so that "[o]thers similarly situated to the defendant [are] made to understand that when you get caught, you will go to jail." *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012). The court explained that "community service" – which the defendant in *Gupta* had requested – would "totally fail to send this message." *Id.* Judge Rakoff ultimately sentenced the defendant in *Gupta* to 24 months in prison and that case, unlike this one, did not involve unnecessary medical procedures being performed on homeless and destitute individuals.

It is obvious from the letters submitted by Elefant and his supporters that Elefant does not want to go to prison. But that dread of prison is by no means unique to Elefant and is precisely the reason why this Court should impose a Guidelines sentence in this case. Such a sentence will send the message to other would-be fraudsters that, when you get caught, the consequences will be steep and will serve to deter future misconduct.

Finally, the Court should put little weight in the fact that the defendant is a first-time offender. In almost all cases where lawyers or other professionals are convicted and sentenced for crimes, they are first time offenders. Elefant would not have been in a position to commit these crimes if he had a criminal record. Nonetheless, because of the need to promote general deterrence, prison sentences are routinely imposed in white collar cases involving first-time offenders.

3. <u>The Need to Impose a Just Punishment and Promote Respect for the Law</u>

Section 3553(a)(2)(A) provides that the Court must consider the need for a sentence to "provide just punishment for the offense" and promote respect for the law. 18 U.S.C. § 3553(a)(2)(A). In this regard, a term of imprisonment of 46 to 57 months' imprisonment is critical.

The defendant is a highly educated professional.  He finished college and law school and, as reflected in the hundreds of letters submitted in support of him at sentencing, is surrounded by a community of family and friends.  His crimes, however, were heinous.  He was, in many ways, the gatekeeper to this scheme.  Once Elefant accepted a case, the wheels were in motion and funding agreements and surgeries followed.  This crime offends society's fundamental sense of fairness and justice, and a meaningful prison term is necessary to provide just punishment for the offense.

Moreover, even though Elefant committed his crimes from a lawyer's office, he should not be treated any more favorably than the fraud scheme defendants who were on the ground doing the dirty work like recruiting patients from homeless shelters.  This Court has already sentenced those fraud scheme participants to lengthy prison terms, and Elefant should fair no better.  As Judge Colleen McMahon explained in *United States v. Binday*, 12 Cr. 152 (CM), a case that involved an insurance fraud scheme where the defendant was sentenced to 144 months' imprisonment, "[o]nly if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath."  *Id.* (Dkt. No. 349, Sent. Tr., at 46); *see id.* at 45 ("There are crimes for which a critically important component of sentencing should be to send a message to the community, for the industry that this kind of behavior is intolerable, and to send a message to the community and to the industry that this sort of behavior is every bit as reprehensible as the types of crimes for which I and others like me routinely send poor, disadvantaged persons to prison for dozens of years."); *see also Gupta*, 904 F. Supp. 2d at 355 ("While no defendant should be made a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant. No sentence of

probation, or anything close to it, could serve this purpose."). Thus, the need for the sentence to provide just punishment for the offense also weighs heavily in favor of a 46 to 57 month-sentence.

For similar reasons, the need for the sentence to promote respect for the law also weighs in favor of a sentence of 46 to 57 months' imprisonment. Our society depends on people following the rules and not cheating others to get ahead or make a quick buck. Moreover, we rely on lawyers to hold people accountable when they break these rules. But when those lawyers break the rules themselves, it is incumbent on the Court – the branch of Government with the power to punish – to sentence sternly and send the message that laws must be followed, and cheating and stealing will be punished. Thus, the ideas of promoting respect for the law also weigh in favor of a Guidelines sentence.

4.   The History and Characteristics of the Defendant Do Not Justify a Term of Probation

Finally, Section 3553(a)(1) provides that the Court must consider the "history and characteristics of the defendant" in sentencing the defendant. 18 U.S.C. § 3553(a)(1). The Government agrees that the Court should consider all aspects of the defendant but disagrees that the defendant's history and characteristics justify a non-incarceratory sentence.

First, the defendant points to his family situation and particularly his two daughters, who appear to have suffered greatly from the defendant's arrest and guilty plea. (Def. Mem. 57-60). The defendant seems to be arguing that the Court should impose a non-incarceratory sentence because prison would be too hard on Elefant's daughters and would cause them even more anxiety, stress and depression. The Government is sympathetic to the pains that convictions and prison have on the family members of defendants. This is the case in nearly all cases where a defendant has children, and particularly young children. But it is unfair to ask the Court to vary downward to avoid causing anxiety to family members where that anxiety, by in large, stems from the

16

defendant's misconduct in the first place.  And while it is true that Elefant's youngest daughter seems to have certain of these conditions prior to the defendant's arrest, that is just another reason the defendant should have made different choices when he got involved in this scheme.

Here, the defendant's heavy reliance on *United States v. Lehmann*, 513 F.3d 805, 806 (8th Cir. 2008), is misplaced.  (Def. Mem. 59).  In *Lehman*, the defendant was convicted of being a felon in possession of a firearm after her 8-year-old son found his 14-year-old sister in a pool of blood from a self-inflicted gunshot wound.  513 F.3d at 806.  The daughter died from her injuries and the son suffered extreme emotional distress from the incident.  The court varied downward to a term of probation noting that the defendant had already suffered enough from the loss of her daughter and that the son would "suffer a setback in his overall development, if his mother were removed from his life."  *Id.* at 807.

The facts of Elefant's case could not be any more different.  Unlike the son in *Lehman*, the defendant's young daughter has several supporting adult figures in her life, including her mother, and while she is close to her father, the throwaway line in Dr. Reichman's letter that "I am concerned about the profound emotional toll that having her father incarcerated will have on Grace's well-being, emotional health and overall development" is hardly sufficient to justify a downward variance here.  (*See* Def. Mem., Ex. GG).  Thus, the defendant's first argument does not support a downward variance.[8]

---

[8] The other cases cited by Elefant are also inapposite.  (*See* Def. Mem. 57-58).  In *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992), for example, the "extraordinary family circumstances" that justified a downward departure were that the defendant was the sole caregiver for four young children, including an infant.  Those facts are not present here.  The same is true for *United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997), where the court found that the "family unit would probably be destroyed" if the defendant-father, who had attempted to arrange a drug deal with a confidential informant, were imprisoned where (i) the mother did not speak English, (ii) had limited earning potential for her two young children, and (iii) there were no family members who could assist in the father's absence.

Second, the defendant points to his life of charity and religious devotion as a basis for a downward variance.  (Def. Mem. 60-77).  The Government disagrees.  These attributes, while positive, do little to mitigate the defendant's involvement in this heinous crime.  If anything, they prove that the defendant knew better and should have made different choices.  Moreover, noticeably absent from his life of charity are any charitable acts towards the low-income neighborhoods he and his co-conspirators preyed upon for the success of the scheme.  Notably, all of the cases cited by the defendant in support of a variance are from out of the Circuit, and many involve meaningfully different facts.  *See, e.g.*, *United States v. Serafini*, 233 F.3d 758, 762 (3d Cir. 2000) (departure in case involving false statement to the grand jury by state legislator who had mentored young man with a disability); *United States v. Fred E. Cooper,* 394 F.3d 172, 176-78 (3d. Cir. 2005) (departure in securities fraud case for "exceptional" charitable giving and where crime was limited to financial harm); *United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (tax fraud case); *United States v. Robinson,* 2014 U.S. Dist. LEXIS 48944; 2014 WL 1400197 (D.N.J. Apr. 9, 2014) (tax fraud case).  Thus, a variance is not justified on this basis either.

Third, it is undisputed that Elefant and his family have strong community support.  That fact, however, does not justify a variance as the defendant claims.  If anything, this community support proves that Elefant's family will be able to manage – likely better than other families – during his period of incarceration.  And that while the months and years will be difficult, his family will have the support to persevere and greet Elefant on the other side.

### 5.   The Defendant's Remaining Arguments Are Unpersuasive

The defendant raises a few additional arguments in his sentencing memorandum which the Government addresses below.

First, the defendant claims that a non-incarceratory sentence is appropriate because the Bureau of Prisons cannot accommodate his emotional and physical conditions. (Def. Mem. 90-96). These emotional and physical conditions include diabetes, obesity, high cholesterol, shoulder pain, back pain, and anxiety. But nothing Elefant describes rises to the level of a unique medical ailment that cannot be accounted for while in BOP custody. Rather, they are rather standard conditions that many middle-aged defendants experience. Moreover, anxiety is a fairly common emotion for any defendant faced with the prospect of going to prison. Thus, the defendant's first argument should be rejected.

Second, the defendant claims that comparable crimes have resulted in shorter prison terms than the Guidelines here, and that the median prison sentence for a fraud case is 6 months imprisonment. (Def. Mem. 96-99). What this argument overlooks is that not all frauds are the same, and that few are as heinous as the defendant's fraud, where vulnerable patients underwent medically unnecessary surgeries. This argument also ignores the prison sentences that this Court already imposed on fellow scheme participants, including Bryan Duncan (72 months), Ryan Rainford (68 months), Robert Locust (48 months), and Sady Ribeiro (36 months).

## **CONCLUSION**

For the reasons set forth above, the Court should impose a Guidelines sentence of 46 to

57 months' imprisonment.

Dated:  New York, New York
        April 7, 2023

                                        Respectfully Submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney for the
                                        Southern District of New York


                        By:  _____/s/_____
                                        Nicholas Chiuchiolo
                                        Nicholas Folly
                                        Danielle Kudla
                                        Alexandra Rothman
                                        Assistant United States Attorneys
                                        (212) 637-2580

Cc:     Defense Counsel
        (Via ECF)